**In re INITIATIVE PETITION NO. 362 STATE QUESTION 669.**

No. 84769.

Supreme Court of Oklahoma.

July 11, 1995.

Gary W. Gardenhire, Norman, for proponents, Oklahomans for Property Tax Reform, and John Branscom.

Michael C. Turpen, Richard A. Mildren, Riggs, Abney, Neal, Turpen, Obison & Lewis, Tulsa, and Doug Wilson, Corley & Ganem, Tulsa, for protestants, Paul Barby, Frank Kellert, Merlin Short, Johnnie R. DeSpain, The Ass'n of County Com'rs of Oklahoma, The Oklahoma Public Employees Ass'n, Cooperative Council for Oklahoma School Administration, Oklahoma Vocational Ass'n, and the Oklahoma State School Boards Ass'n.

D. Kent Meyers, Roger A. Stong, Crowe & Dunlevy, Oklahoma City, for protestants Barbara Smith, Leslie Kelly, and Rosalie Carlyle.

WATT, Justice.

In this opinion we will consider an appeal from the Attorney General's wording of the ballot title for Initiative Petition 362, State Question 669, and decide whether the gist of the proposition is sufficient. We will also pass on Protestants' claim that, if passed, the Initiative would be unconstitutional. The

Initiative would amend the Oklahoma Constitution to both limit the dollar amount of ad valorem taxes payable on real property, and change the manner in which such taxes could be increased.

## I.

## THE BALLOT TITLE AND GIST ISSUES

### A. The ballot title is incomplete and misleading and must be corrected.

■ Proponents, and some Protestants, have appealed from the Attorney General's wording of the ballot title.[1] Proponents contend that the language in part b of the first paragraph, "not less than 60% of the qualified voters of an assessing jurisdiction [must]

1. The entire ballot title prepared by the Attorney General, with the portion emphasized that Proponents object to, is set out below:
BALLOT TITLE
This measure would add a new section to Article X of the Oklahoma Constitution. The new section would limit the total amount of property tax that could be levied on a parcel of real property. Under this new limitation, the actual dollar amount levied on a parcel of land could not exceed the amount levied on that parcel in 1993. Under specified conditions, increases in overall property taxes could occur when:
a. Voters approve additional millage, or
b. Not less than 60% of the qualified voters of an assessing jurisdiction approve a percentage increase—of no more that 3%—to the previous personal property tax paid;
Under specified conditions, increases in property taxes on individual parcels could occur when:
a. There is a conveyance or transfer of ownership;
b. Permanent improvements are placed upon the real property; or
c. Termination of the tax exempt status of the land occurs.
Increases in the tax on individual parcels could not, however, be based only on increases in value—no mater how great. The new section makes other changes.
SHALL THIS PROPOSAL BE APPROVED BY THE PEOPLE?
___ Yes for the Proposal
___ No, against the Proposal
[Emphasis added.]

2. The full text of the proposed amendment follows:
BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA THAT A NEW SECTION TO BE DESIGNATED AS SECTION 9E,

approve a percentage increase ...," misstates the true requirement of the proposed amendment. Proponents accept the balance of the Attorney General's ballot title.

Some Protestants urge us to substitute the words "qualified electors" for the words "voters" and "qualified voters" in parts a and b of the first paragraph of the Attorney General's ballot title. For the reasons stated below we find that part a is sufficient, but part b must be changed.

Section 9E.B.2 of the proposed amendment states that any ad valorem tax increase must be approved by "not less than sixty percent (60%) of the qualified electors of an assessing jurisdiction, voting at an election held on the first Tuesday following the first Monday in November."[2] The phrase has two compo-

BE ADDED TO ARTICLE X OF THE OKLAHOMA CONSTITUTION, TO READ AS FOLLOWS:
9E.A. The total amount of any ad valorem tax levied upon any parcel of real property shall not exceed the amount of tax which was actually levied upon such real property during the year ended December 31, 1993, referred to in this Section as "Dollar Amount", except as provided by subsection B in this Section.
B. The Dollar Amount of ad valorem tax levied upon any parcel of real property as is established by Subsection A of this Section shall be adjusted in the year in which any of the following events enumerated within this Subsection occur to reflect a current Dollar Amount, referred to in this Section as the "Adjusted dollar Amount", and such adjustment shall be effective on January 1 of each year following, upon the occurrence of any of the following events and in the manner specified in conjunction with the occurrence of the event:
1. after the qualified electors of a taxing jurisdiction adopt additional millage above that amount which was authorized within said taxing jurisdiction as of December 31, 1993; provided any such Adjusted Dollar amount shall not increase the previous Adjusted dollar amount of ad valorem tax levied upon any real property by more than the application of the millage approved; or
2. after not less that sixty percent (60%) of the qualified electors of an assessing jurisdiction, voting at an election held on the first Tuesday following the first Monday in November, authorize an Adjusted dollar amount to real property within said assessing jurisdiction; provided, any such approval shall not increase the previous Adjusted Dollar Amount of ad valorem tax levied upon said real property by more than three percent (3%); or

nents: it requires, (1) that at least 60% of those voting in an ad valorem tax election vote to authorize the increase, and (2) any such election be held on a first Tuesday after a first Monday in November. The Attorney General's ballot title would fail to inform the electorate of either component. The Attorney General's ballot title could also lead voters to believe that 60% of all registered voters in an assessing jurisdiction have to approve any ad valorem tax increase, whether or not they voted in the tax increase election. These inaccuracies must be corrected.

The requirements for ballot titles are set forth in 34 O.S.Supp.1994 § 9.B.[3] Part b of

3. after any conveyance or other transfer of title ownership in and to such real property, or any part or parcel thereof, to any person who bears a relationship beyond the second degree of affinity or consanguinity to the grantor; provided, any such Adjusted Dollar Amount shall not increase the previous Adjusted Dollar Amount of ad valorem tax levied upon any real property conveyed by more than the tax assessed under the existing tax rate as applied to the actual consideration paid or received in connection with such conveyance or other transfer of title; or
4. after any permanent improvement is placed upon such real property by virtue of new construction, or expansion of previous improvements made upon the real property, or renovation or existing improvements made upon the real property, or the like; provided, any such Adjusted Dollar Amount shall not increase the previous Adjusted Dollar Amount of ad valorem tax levied upon any such real property by more than the tax assessed under the existing tax rate as applied to the capitalized book value of any such new construction, expansion, renovation or the like; or
5. any real property exempt from ad valorem tax shall retain its exempt status if it otherwise qualifies or continues to qualify for exemption in the manner provided by law; provided, upon termination of tax exempt status, any such real property shall be assessed for taxation in the manner provided by law to arrive at the Adjusted Dollar Amount.
C. No such requirement for an Adjusted dollar Amount as provided for in Subsection B of this Section shall be used or construed to change or otherwise alter the use classification of any property, but the use classification of any property shall continue to be defined and governed according to the provisions of Section 8 of Article X of the Oklahoma Constitution.
D. Before an election is held to increase any ad valorem taxes levied upon any real property as provided in Subsection B of this Section, election officials shall be required to mail notice of such election to all registered voters within the taxing jurisdiction. The notice of election shall be mailed not less than fifteen (15) days nor more than twenty-five (25) days prior to the election within an envelope that has "NOTICE OF ELECTION TO INCREASE TAXES": legibly printed on the front. The notice of election shall list:
1. the election date, hours, polling place, text or accurate summary of the proposal, and election office address and telephone number;

2. the estimate of the taxing jurisdiction of its revenue increase in dollars from the proposed changes in the first full fiscal year of each change;
3. for the current and each of the past four years, the estimated or actual total of the fiscal year spending of the taxing jurisdiction, and the cumulative change in dollars and in percentage terms which will result from the proposed changes; and
4. the maximum repayment costs of the taxing jurisdiction both annual and cumulative, or any proposed bonded debt to be authorized.
E. The provisions of this Section specifying the method and manner of accomplishing increases in the ad valorem tax levied upon real property shall apply, whether any such tax increase is occasioned by an increase in the valuation of real property, by an increase in the assessment ratio of any taxing jurisdiction, by an increase in the mean or median assessment ratio established by the State Board of Equalization, or by any other assessed valuation increase or millage increase authorized by existing law, or by a combination of two or more of these methods.
F. The provisions of this Section shall be construed in favor of the limitations established herein. No provision of this Section shall be construed to preclude a decrease in the ad valorem tax.
G. Any ad valorem taxpayer has standing to sue to enforce the provisions of this Section and laws implementing it. If a taxpayer prevails, he or she shall be reimbursed for all reasonable costs of the suit, including attorney fees.
H. The provisions of this Section shall become effective January 1 of the year following its adoption. In the event any provision of this Section is declared unconstitutional, the courts shall construe the rest and remainder of this Section severally and save and apply the remainder of this Section. Specifically, any date(s) which is construed to be impermissibly retroactive shall be effective the 31st day of December of the year following enactment.

**3.** Title 34 O.S.Supp.1994 § 9.B. provides:
B. The parties submitting the measure shall also submit a suggested ballot title which shall be filed on a separate sheet of paper and shall not be deemed part of the petition. The suggested ballot title:
1. Shall not exceed two hundred (200) words;
2. Shall explain in basic words, which can be easily found in dictionaries of general usage, the effect of the proposition;

the first paragraph of the Attorney General's ballot title does not accurately "explain ... the effect of the proposition." *Id.* When we determine that a ballot title does not satisfy § 9.B's requirements, 34 O.S.1991 § 10.A authorizes us to correct it.[4] Consequently, we have rewritten part b of the ballot title to more adequately explain the number of votes required to raise taxes and when elections to raise taxes must be held.

Neither the Attorney General's ballot title nor Protestants' suggested changes refer to the language in § 9E.B.2, "voting at an election held on the first Tuesday following the first Monday in November." In describing the term, "voting at an election held on the first Tuesday following the first Monday in November," in our substituted ballot title, we have substituted the term "General Election" for "at an election held on the first Tuesday following the first Monday in November" because 26 O.S.1991 § 1–101 provides that "General Elections" are those held "on the first Tuesday succeeding the first Monday of November."

In the substituted ballot title we have substituted the term "registered voter" for the proposal's "qualified elector," and the Attorney General's "qualified voter." We have made this change because Article III § 1,

Okla. Const., provides that the term "qualified elector" includes legislatively imposed exceptions to the right of qualified electors to vote.[5] Thus, the term "qualified elector," standing alone might be misunderstood to mean any person over the age of 18 residing in the taxing district, although it would be impossible to accurately count how many such persons there were. Title 26 O.S.1991 §§ 4–101 and 4–102 require that qualified electors must be registered to vote.[6] Construing these statutes together with 26 O.S. 1991 § 1–101 and Article III § 1, Okla. Const. we conclude that "qualified elector" as used in the proposal must mean "registered voter," and we have used the term "registered voters voting on the question" in the substituted ballot title.

The changes we have made in the ballot title make clear that any vote to raise ad valorem taxes must be held at a general election. In other words, the Initiative would prohibit such votes from being held at special, primary, or runoff elections. For this reason we have expressly said in the substituted ballot title that any such vote must be held at a general election. Our changes also show that the 60% requirement refers to voters voting on the question, and

3. Shall be written on the eighth-grade reading comprehension level;
4. Shall not contain any words which have a special meaning for a particular profession or trade not commonly known to the citizens of this state;
5. Shall not reflect partiality in its composition or contain any argument for or against the measure;
6. Shall contain language which clearly states that a "yes" vote is a vote in favor of the proposition and a "no" vote is a vote against the proposition; and
7. Shall not contain language whereby a "yes" vote is, in fact, a vote against the proposition and a "no" vote is, in fact, a vote in favor of the proposition.

4. Title 34 O.S.1991 § 10.A provides:
 Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is filed by the Attorney General with the Secretary of State as provided for in Section 9 of this title, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the

appeal is taken. Upon the hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to the provisions of Section 9 of this title.

5. Art. III § 1, Okla. Const. provides:
 *Subject to such exceptions as the Legislature may prescribe,* all citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this state, are qualified electors of this state. [Emphasis added.]

6. Title 26 O.S.1991 § 4–101 provides:
 Every person who is a qualified elector as defined by Section 1 of Article III of the Oklahoma Constitution shall be entitled to become a registered voter in the precinct of his residence ...
 Title 26 O.S.1991 § 4–102 Provides:
 No person shall be permitted to vote in any election conducted by any county election board unless such person is a registered voter, unless otherwise provided by law.

no one else. The substituted ballot title shall be as follows: [7]

### BALLOT TITLE

This measure would add a new section to Article X of the Oklahoma Constitution. The new section would limit the total amount of property tax that could be levied on a parcel of real property. Under this new limitation, the actual dollar amount levied on a parcel of land could not exceed the amount levied on that parcel in 1993. Under specified conditions, increases in overall property taxes could occur when:

a. Voters approve additional millage, or

b. *By vote, which must be held during a General Election, 60% or more of registered voters voting on the question approve increasing property taxes; no increase may exceed 3% of the previous tax paid;*

Under specified conditions, increases in property taxes on individual parcels could occur when:

a. There is a conveyance or transfer of ownership;

b. Permanent improvements are placed upon the real property; or

c. Termination of the tax exempt status of the land occurs.

Increases in the tax on individual parcels could not, however, be based only on increases in value—no matter how great. The new section makes other changes.

**SHALL THIS PROPOSAL BE APPROVED BY THE PEOPLE?**

___ Yes, for the Proposal

___ No, against the Proposal

The Attorney General is directed to notify the Secretary of State and the State Election Board of the substituted ballot title and insure that the substituted ballot title, without the emphasis shown in part b of the first paragraph, appears on the printed ballots.

7. The substituted ballot title differs from the Attorney General's ballot title only where emphasized.

8. At the top of each signature page of the Initiative there appeared the following gist of the proposition:

### B. The gist of the Initiative satisfies statutory requirements.

 Some Protestants complain that the gist of the proposition fails to adequately explain the proposition.[8] These Protestants contend that the gist of the proposition fails to explain the extent of the changes that would actually be made. Protestants would require too much of the gist of an initiative petition. The gist of a proposition, which is required by law to appear at the top of each signature page, need only contain "a simple statement of the gist of the proposition." 34 O.S.Supp.1992 § 3. The gist need not satisfy the more extensive requirements for ballot titles contained in 34 O.S.Supp.1994 § 9. *In re Initiative Petition No. 347, State Question No. 639*, 813 P.2d 1019, 1026 (Okla.1991); *In re Initiative Petition No. 341, State Question No. 627*, 796 P.2d 267, 274 (Okla.1990). The gist of a proposition must be short. As it must appear at the beginning of every page of the petition, it can contain no more than a shorthand explanation of a proposition's terms. This Initiative's gist explained that the proposition would limit annual increases in property taxes, establish a vote of the people to increase them, and define procedures for increasing them. This was sufficient. The statement of the Initiative's gist satisfies 34 O.S.Supp.1992 § 3.

### II.

### THE CONSTITUTIONAL ISSUES

 Protestants claim that the Initiative would be unconstitutional if passed, and urge us to declare it invalid and refuse to submit it to a vote of the people. For the reasons discussed in the balance of this section, we hold that the Initiative is not facially violative of constitutional requirements. It is, therefore, legally sufficient and we direct that it be submitted to the people for their vote.

This measure will amend the Constitution to limit annual increases in property taxes, establish a vote of the people to increase the amount of annual property tax, and define procedures for increasing real property taxes.

■ This Court has traditionally refused to declare a ballot initiative invalid in advance of a vote of the people except where there is a "clear or manifest" showing of unconstitutionality. *In re Initiative Petition No. 358, State Question No. 658,* 870 P.2d 782 (Okla.1994). The right to pass legislation and change the Constitution through the initiative process is a fundamental right of the people and must be jealously guarded. Our Constitution provides, "the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature." Okla. Const. Art. V. § 1. All doubt as to the construction of a proposed initiative "is to be resolved in favor of the initiative." *In re Initiative Petition No. 348, State Question No. 640,* 820 P.2d 772 (Okla. 1991). Thus, unless Protestants can show that this Initiative clearly and manifestly violates either the Oklahoma or United States Constitution, the Initiative is legally sufficient.

Protestants complain that the Initiative violates equal protection and due process rights, impairs existing contracts, violates the right to free speech and to petition the government, and deceives and misleads the public. We find nothing on the face of the initiative to support any such contention.

## A. The Initiative does not facially violate the equal protection clause.

■ This Initiative would establish December 31, 1993, as the date on which the amount of taxes paid on continuously owned real property is fixed. That amount could be raised only when property has been bought, or there has been new construction or transfer of ownership outside the owners' immediate family. The Initiative would base the amount of ad valorem taxes paid on the acquisition value of real property rather than on its current fair market value.

Protestants claim that the Initiative would violate equal protection requirements because persons buying property after the Initiative had been in effect for some time would pay higher ad valorem taxes than those owning property of the same value whose ad valorem taxes were frozen at 1993 rates. Such a distinction does not facially violate the equal protection clause.

■ In general, the equal protection clause is satisfied if there is a plausible reason for classification. States have broad latitude to create classifications within the context of complex tax laws. Unless a classification jeopardizes the exercise of a fundamental right or is based on an inherently suspect characteristic, the equal protection clause needs only further a legitimate state interest. *Williams Natural Gas Company v. State Board of Equalization,* 891 P.2d 1219, 1222 (Okla.1994), citing *Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). We see no such failing on the face of this initiative.

In 1978, Californians approved an initiative petition similar to this Initiative, which implemented an acquisition value ad valorem taxation system, known as Proposition 13.[9] The United States Supreme Court held that Proposition 13 satisfied equal protection requirements in *Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). There, the court concluded that states may legitimately conclude that a prospective owner does not have the same interest in limiting the growth of property taxes as a current owner. The court held:

> A new owner has full information about the scope of future tax liability before acquiring the property, and if he thinks the future tax burden is too demanding, he can decide not to complete the purchase at all. By contrast, the existing owner, already saddled with the purchase, does not have the option of deciding not to buy his home if taxes become prohibitively high.

*Id.* 505 U.S. at 13, 112 S.Ct. at 2333. The court also held that states can structure their property tax systems to encourage long-term ownership because they have a legitimate interest in maintaining local neighborhoods.

9. One of the members of the coalition that forms Proponent, Oklahomans for Property Tax Reform, is the Howard Jarvis Taxpayers Association, which was one of the drafters of Proposition 13.

The analysis of the *Nordlinger* court applies to this Initiative and we adopt it.

In 1990, Oregon voters adopted an initiative known as Measure 5 that amended the Oregon Constitution to limit the amount of taxes on real property for public schools and other government operations. While the methods to limit the growth of taxes used in Measure 5 differed from those used in California's Proposition 13, and this Initiative, the goal is the same in all three cases: to slow the growth of property taxes.

The Oregon supreme court upheld the constitutionality of Measure 5 in *Savage v. Munn*, 317 Or. 283, 295, 856 P.2d 298, 304 (1993). Measure 5 made it possible for one property owner to pay more to one taxing authority than would another (although not more to all taxing authorities combined) who owned property of the same value. The *Savage* court rejected the contention that Measure 5 violated the Equal Protection Clause. Citing *Nordlinger*, the *Savage* court held that "the federal Equal Protection Clause does not require uniformity of property taxation." *Nordlinger*, and *Savage* make clear that the system of ad valorem taxation proposed by the Initiative before us today does not violate equal protection requirements.

### B. The Initiative does not facially impose upon the right to travel.

█ Protestants claim that because one who moved into Oklahoma and bought realty would pay higher ad valorem taxes than current owners, the nonresident's right to travel is impinged. This argument could have force only if one assumed that Oklahoma residents would not buy property after the effective date of the Initiative, and that only Oklahoma residents own Oklahoma real estate. We reject these assumptions and reject this argument. The proposed amendment would not, on its face, invidiously discriminate against nonresidents.

### C. The Initiative does not facially limit the right to vote.

█ The Initiative would require that notice of an election to raise taxes "be mailed not less than fifteen (15) days nor more than twenty-five (25) days" before the election.

*Id.* § 9E.D. Protestants cite a comment made by the Director of the Federal Voter Assistance Program that at least forty-five days notice of an election should be given to overseas voters. From this, Protestants conclude that the twenty-five-day limitation impinges upon the right to vote of eligible voters who are overseas. We disagree. This pre-election review of the Initiative is not the time to consider such an issue. No overseas voters have protested, and it is far from certain that the Initiative would deprive such voters of their constitutionally protected rights. Certainly Protestants' showing on this point fails to show "clear and manifest" unconstitutionality. *In re Initiative Petition No. 358*, 870 P.2d 782, 785 (Okla.1994).

### D. The Initiative has not been shown to have any potentially discriminatory impact on minorities.

█ Because fewer members of racial minorities own real property than others, Protestants contend that the Initiative would discriminate against them. This contention assumes that only members of racial minorities buy real property, a contention that we reject as being patently untrue. Once again there is no showing of "clear and manifest" unconstitutionality. *Id.*

### E. The Initiative would not impair existing contract rights.

█ Protestants claim that the Initiative would impair existing contract rights. They base their contention on three assumptions: (1) The Initiative sets December 31, 1993, as the base period for taxing property. (2) Taxing districts would incur bonded indebtedness after December 31, 1993, but before the Initiative was approved by the voters. (3) Therefore, the bond holders would not be paid. We disagree. In the first place, Protestants' contention ignores express language in the Initiative that would solve any problem in this regard. Protestants fail to point out that the Initiative provides, "any date(s) which is construed to be impermissibly retroactive shall be effective the 31st day of December of the year following enactment." Where an initiative "expressly provides for severability" we will

not declare one of its sections unconstitutional at the pre-election stage. *In re Initiative Petition No. 358*, 870 P.2d 782, 787 (Okla. 1994). Second, even under the unlikely assumption that a taxing entity would refuse to pay its bonds because of the adoption of this initiative, this provision would give any bond holder the right to go to court and ask the court to set a later base date that would protect its rights. Finally, Protestants' contention is wholly speculative.

### F. The Initiative would not violate the right to freedom of speech or the right to petition the government for change.

As discussed in Section II.*C*, above, the Initiative would require taxing entities to mail notices of election in advance of any vote to increase ad valorem taxes, and give any taxpayer who prevailed in an action to enforce the provisions of the Initiative the right to a reasonable attorneys' fee. Protestants claim that these provisions have a chilling effect on free speech and the right to petition the government for change. How this is so is unclear to us, as it is the government that proposes increases in ad valorem taxes. It is the government, not its people, who might feel constrained to avoid attempting to raise taxes because of the notice and attorneys' fee provisions of the Initiative. Constitutional limitations on government's desire to raise taxes can hardly be said to violate anyone's free speech rights under the First Amendment.

### G. The Initiative neither deceives nor misleads the public.

Protestants' contend the Initiative would require that sixty percent of all residents over the age of eighteen in an assessing district, whether or not registered to vote, approve a tax increase. In addition, Protestants say that the Initiative requires sixty percent of the qualified electors in a county. Protestants conclude that Proponents are deceiving and misleading the public by saying that only sixty percent of those voting on the

measure at a tax increase election must approve a tax increase. Although all doubt in the construction of a proposed initiative "is to be resolved in favor of the initiative," Protestants' arguments would require us to interpret this Initiative in a strained and unreasonable way so as to declare it unconstitutional. This we cannot do. *In re Initiative Petition No. 348*, 820 P.2d 772, 775 (Okla. 1992). As we pointed out in our discussion of the ballot title in part I.*A* of this opinion, the Initiative would require only sixty percent of those voting on the issue in an election to approve a tax increase. Consequently, we reject Protestants' claims of unconstitutionality on this score.

KAUGER, V.C.J., and HODGES, LAVENDER, SIMMS, HARGRAVE and SUMMERS, JJ., concur.

OPALA, J., concurs in result.

ALMA WILSON, C.J., concurs in part, dissents in part.

OPALA, Justice, concurring in result.

The court declares today that the initiative measure under consideration—which in substance would limit the total amount of ad valorem tax that could be levied on a parcel of real property and allow increases only under specified conditions—qualifies for submission to a vote of the people and revises part b of the ballot title to more accurately explain (a) the number of votes required to raise ad valorem taxes and (b) when elections to raise ad valorem taxes must be held. While I *concur in clearing the measure for an election*, I write separately to reiterate *my views* on the *outer limit of permissible scrutiny* an initiative measure may undergo when it is before us upon a challenge for alleged legal deficiency.

I would not undertake to test the validity of a measure's content *before* its adoption by a vote of the people. My commitment to the *undiluted force* of *Threadgill v. Cross* [1] continues with *undiminished fervor.* [2] *Thread-*

---

1. 26 Okl. 403, 109 P. 558 (1910).

2. My unswerving commitment to *Threadgill, supra* note 1, is documented in several reported decisions. *See In re Initiative Petition No. 360,*

Okl., 879 P.2d 810, 821 (1994) (Opala, J., concurring in result); *In re Initiative Petition No. 358,* Okl., 870 P.2d 782, 788 (1994) (Opala, J., concurring in result); *In re Initiative Petition No. 349,*

*gill* teaches that conformity of a measure's content to the commands of our constitution—state and federal—may not be judicially examined *in advance of the initiative petition's adoption by the people.* Presubmission review of a measure's fundamental-law conformity *should be confined to fatally vitiating infirmities in the initiative process itself.* The electorate's effort at legislating *directly must not* be hindered by pre-election attacks *other* than those which target the petition's compliance with some *sine qua non requirement for submission.*

While on its journey to the ballot box a measure proposed by initiative petition is entitled to the same judicial deference that is accorded a legislative bill in progress. Judges cannot police the lawmaking process for conformity to the constitution without raising an impermissible restraint on the free exercise of political activities.[3] Just as the passage of a seemingly infirm bill in progress will not be enjoined to save the cost of processing the act through the Houses of the Legislature, so, too, an initiative that *passes muster for submission* should not be condemned in advance of the measure's adoption just to avoid a costly election. The *burden or loss borne* by the people when an election

fails because the law is later held invalid is the *price to be paid* for our system of constitutional democracy that authorizes the electorate to legislate directly.[4] Only in the clearest case of *firmly settled* and *stable* constitutional jurisprudence that *absolutely* condemns a proposed measure as facially impossible of enforcement, application or execution—and then *only if the protestants have standing to complain* of constitutional infirmity—should this court ever undertake to trump an initiative petition that otherwise meets submission requirements.

The measure under consideration is fit for submission; I hence concur in the court's rejection of the petitioners' constitutional challenge but not in today's pronouncement.

Okl., 838 P.2d 1, 18 (1992) (Opala, C.J., dissenting); *In re Initiative Petition No. 348*, Okl., 820 P.2d 772, 781 (1991) (Opala, C.J., concurring in result); *In re Initiative Petition No. 347*, Okl., 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *In re Initiative Petition No. 341*, Okl., 796 P.2d 267, 275 (1990) (Opala, V.C.J., concurring in result); *In re Initiative Petition No. 317*, Okl., 648 P.2d 1207, 1222 (1982) (Opala, J., concurring in the judgment); *In re Initiative Petition No. 315*, Okl., 649 P.2d 545, 554–555 (1982) (Opala, J., concurring in result); *see also In re Initiative Petition No. 349* (No. 76,437, Feb. 20, 1991) (Opala, C.J., concurring in part and dissenting in part) (unpublished opinion).

**3.** *Advocacy* for or against a proposed law is *the purest form of political speech.* Restraint upon free speech is prohibited by the terms of Art. 2, § 22, Okl. Const., which provide in part:

"Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right...."

**4.** The constitutional provisions governing the initiative and referendum are Art. 5, §§ 1–8, Okl. Const. The terms of § 1 are:

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate

and a House of Representatives; but *the people reserve to themselves the power to propose laws and amendments* to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." (Emphasis added.)

In *Oklahoma Tax Commission v. Smith*, Okl., 610 P.2d 794, 807 (1980), we stated that Art. 5, §§ 1, 2 and 7, Okl. Const., together "comprise an initiative system whereby both the people and the Legislature may propose legislation independently, and neither *can block the effort of the other during the process...*." (Emphasis added.) Our teaching in *Smith* applies with equal force to bar *judicial* as well as *legislative interference* with initiative process. Courts should be loath to impose judicial restraint on the electorate's power to make law. As the Arizona Supreme Court aptly remarked in *State v. Osborn*, 16 Ariz. 247, 248, 143 P. 117, 118 (1914), to place court-imposed restrictions "would be tantamount to claiming the power of life and death over every initiated measure by the people. It would limit the right of the people to propose only valid laws, whereas the other lawmaking body, the Legislature, would go untrammeled as to the legal soundness of its measures."