2004 OK 75

**In re LEGISLATIVE REFERENDUM NO. 334, STATE QUESTION 711.**

No. 101,136.

Supreme Court of Oklahoma.

Sept. 23, 2004.

*ORDER*

The Court declines to assume original jurisdiction.

WATT, C.J., OPALA, V.C.J., LAVENDER, HARGRAVE, WINCHESTER, EDMONDSON, JJ., concur.

KAUGER, J., concurring specially.

OPALA, V.C.J., with whom EDMONDSON, J., joins, concurring.

¶1 Petitioners invoke this court's original cognizance, conferred by the terms of Art. 7 § 4, Okl. Const., to target for removal from the general election ballot of Legislative Referendum No. 334, State Question No. 711. The question refers for the electorate's approval (or rejection) a provision to be added to the state constitution [1] which, among other

ignated as Art 2 § 35; it is submitted to the

things, would confine legal recognition of marriage status (and its incidents) to a heterosexual union.

¶ 2 The court **denies the petitioners' application to assume its original jurisdiction without assigning reasons for today's action.** I join the court's disposition of the case and write in concurrence. Mindful though I am that ordinarily *sapienti verbum satis*,[2] I nonetheless feel compelled to do more **by providing an explanation for why the ballot-purging relief the petitioners seek is not their constitutional due.**

¶ 3 None of the petitioners' multiple arguments identifies the presence in the referendum's text **of even a single fatal state or federal constitutional flaw that facially taints the measure** and would prevent it from becoming law upon the electorate's approval. Absent that showing, **this court is powerless to convene itself as a board of censors to purge the ballot of the referendum in contest. Nothing** is tendered for the court's permissible forensic inquiry. **What remains here to be confronted is pure political process in progress.** At this stage the process clearly lies beyond the reach **of judicial scrutiny.** Unenacted measures are not law. Courts may not subject them to presubmission scrutiny for constitutional orthodoxy. The two-century-old extratextual doctrine of judicial review **applies solely** to the law in force, not to lawmaking in progress.[3] **Only those measures which are facially affected by fatal flaws may be judicially barred from submission to a vote of the people.**[4]

## SUMMARY

¶ 4 Whether to be effected through legislative enactments or legislative referenda, through the people's initiative or their referenda, **lawmaking process while in progress** must stand protected by the free-speech clause of the First Amendment and by its state constitutional counterpart in Art. 2 § 22, Okl. Const.,[5] **from impermissible judicial censorship** as well as **from other premature tinkering** attempted **in the name of constitutional scrutiny.** Judicial testing for constitutional orthodoxy which calls **for an examination beyond** the presence of fatal defects that are facially apparent **must await** the measure's transformation into **enforceable law applied in a lively controversy.** Law made by the electorate is not given **greater or lesser immunity from postenactment judicial review** than law passed by the legislative assembly. **Law is law.** It commands equal dignity. A creation of Chief Justice John Marshall,[6] **judicial review does** not sanction forensic scrutiny of **unenacted measures** still passing through the lawmaking track.[7]

¶ 5 I continue to stand by my undiminished commitment to the teachings of this court's early pronouncement in *Threadgill*,[8] which holds that measures proposed for approval by the people as law may not undergo constitutional testing of the textual contents in advance of their adoption by the electorate. Fidelity to the rule in *Threadgill* commands that I today accede to the court's disposition.[9]

voters in the exercise of the Legislature's authority that stands conferred by Art. 24 § 1, Okl. Const.

2. The three-word Latin phrase means: directed to one who is wise, a single-word explanation will suffice. A slight variation of this phrase, identical in meaning, is *verbum sapienti sat est*.

3. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

4. *In re Initiative Petition No. 360, State Question No. 662*, 1994 OK 97, 879 P.2d 810; *In re Initiative Petition No. 362, State Question 669*, 1995 OK 77, 899 P.2d 1145; *see* also *In re Initiative Petition No. 358, State Question No. 658*, 1994 OK 27, 870 P.2d 782, 785–786.

5. The terms of Art.2 § 22, Okl. Const., provide in pertinent part:
   "Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.* * * "

6. *Marbury, supra* note 3.

7. *Threadgill v. Cross*, 1910 OK 165, 26 Okl. 403, 109 P. 558, 561–62.

8. *Threadgill, supra* note 7.

9. My unswerving commitment to *Threadgill, supra* note 7, is documented in numerous reported decisions. *See In re Initiative Petition No. 366*, 2002 OK 21, 46 P.3d 123, 135 (Opala, J., dissenting); *In re Initiative Petition No. 364*, 1996 OK

KAUGER, J. concurring specially.

¶1 I express no opinion on whether, if adopted by the voters of Oklahoma, State Question No. 711 will withstand constitutional scrutiny. However, because of the time frame in which this cause was presented to the Court, I agree with the majority that the we should not intervene before State Question 711 is presented to the voters of Oklahoma for adoption or rejection.

¶2 The Attorney General filed the ballot title with the Secretary of State on April 27, 2004. Under 34 O.S.2001 § 10(A), the petitioners should have filed their protest by May 7, 2004. However, the protest was not filed until August 27, 2004—a date well beyond the time when the Court could consider the issue in the ordinary course of business—four months after the bill was filed with the Secretary of State, after ballot printing had begun and after the first mailings of absentee ballots. Clearly, the protest here is well outside of the ten-day limitation period of 34 O.S.2001 § 10(A).

¶3 The petitioners' untimely actions may be partially justified by the lack of a specific statutory provision providing a time frame for filing a protest. Nevertheless, the petitioners have asked this Court to apply the statutory scheme related to the initiative and referendum process to their protest in so far as it involves the ballot title. It should be noted that 34 O.S.2001 § 10(A)[1] requires protests to ballot titles to be filed within ten days after filing with the Secretary of State.

¶4 The law fixes election dates and the petitioners are well aware that the question is scheduled to appear on the November 2, 2004, general election ballot. They should also be aware of the necessary work required, the time consumed and the cost of causing the ballots to be printed. It is the duty of the petitioners to proceed with the utmost diligence in asserting in a proper forum their claimed rights.[2]

¶5 Laches may bar the right to challenge the balloting process.[3] Although the time has long passed since this Court, when presented with a timely constitutional challenge, will refuse to address a blatantly unconstitutional measure to prevent the costly expenditure of public revenues on needless elections, the challenge must be timely made.

¶6 The rationale for not addressing this issue at this time has nothing to do with the merits or with the reasoning of *Threadgill v. Cross,* 1910 OK 165, 109 P. 558. *Threadgill* has been distinguished, rejected, limited, and eviscerated. It should be expressly overruled. To do anything less is to leave the impression that this Court will not exercise its constitutional duty of protecting those rights afforded to Oklahoma's citizens under the United States and Oklahoma Constitutions. *Threadgill* is now nothing more than a shell game where unaware voters are duped into believing that they have found the "pea" when they cast their vote. Even after an election, if challenged, this Court is still charged with the duty of determining the constitutionality of a measure duly adopted

129, 930 P.2d 186, 205 (Opala, J., concurring); *In re Initiative Petition No. 362,* 1995 OK 77, 899 P.2d 1145, 1153 (Opala, J., concurring in result); *In re Initiative Petition No. 360,* 1994 OK 97, 879 P.2d 810, 821–22 (Opala, J., concurring in result); *In re Initiative Petition No. 358,* 1994 OK 27, 870 P.2d 782, 788 (Opala, J., concurring in result); *In re Initiative Petition No. 349,* 1992 OK 122, 838 P.2d 1, 18–19 (Opala, C.J., dissenting); *In re Initiative Petition No. 347,* 1991 OK 55, 813 P.2d 1019, 1037 (Opala, C.J., concurring); *In re Initiative Petition No. 341,* 1990 OK 53, 796 P.2d 267, 275 (Opala, V.C.J., concurring in result); *In re Initiative Petition No. 317,* 1982 OK 78, 648 P.2d 1207, 1222 (Opala, J., concurring in the judgment); *In re Initiative Petition No. 315,* 1982 OK 15, 649 P.2d 545, 554–555 (Opala, J., concurring in result); see also *In re Initiative Petition No. 349* (No. 76,437, Feb. 20, 1991) (Opala, C.J., dissenting in part) (unpublished opinion).

1. Title 34 O.S.2001 § 10(A) provides in pertinent part:

   "Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is filed by the Attorney General with the Secretary of State as provided for in Section 9 of this title, appeal to the Supreme Court . . ."

2. *Harding v. State Election Bd.,* 1946 OK 171, ¶12, 197 Okla. 291, 170 P.2d 208.

3. See, *Evans v. State Election Bd.,* 1990 OK 132, ¶14, 804 P.2d 1125; *Wickersham v. State Election Bd.,* 1960 OK 245, ¶0, 357 P.2d 421; *Harding v. State Election Bd.,* see note 1, supra.

by the electorate. Only later, do they learn that the "pea" has been "palmed" if the matter is found to be unconstitutional and their votes are counted for naught. It is time to cut the thread on *Threadgill.*

## *Threadgill v. Cross* HAS LOST ALL EFFICACY IN OKLAHOMA JURISPRUDENCE.

¶ 7 In *Threadgill* a writ of mandamus was sought ordering the Secretary of State to file an initiative petition proposing a constitutional amendment. The Secretary of State determined that the proposed repeal of constitutional provisions which prohibited the sale of liquor was contrary to Oklahoma's Enabling Act which required the state of Oklahoma to prohibit the sale of liquor for a period of 21 years in that part of the state formerly designated as Indian Territory. In rejecting the Secretary of State's defense to the mandamus request, the *Threadgill* Court reasoned that under the fundamental doctrine of separation of powers, the Court may not restrain the enactment of an unconstitutional law.

¶ 8 The erosion of the *Threadgill's* hard and fast rule against judicial construction of matters scheduled for submission to the voters was first forecast in 1972—over thirty years ago—in the concurring in part and dissenting in part opinion to *Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton,* 1972 OK 133, ¶ 4, 501 P.2d 1089 [4] which stated:

"By necessity included in any proposed amendment to a vote of the people involves the labor and efforts of many people, together with considerable expense to both the proponents and contestants and to the State of Oklahoma in conducting such an election. Where a proposed initiative petition is unconstitutional upon its face then I believe it is vastly important for this court to make such a determination before it is submitted to a vote of the people."

¶ 9 Three years later, although noting the *Threadgill* rule, the Court adopted the rationale of the concurring in part and dissenting in part opinion in *Shelton. In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma Numbered 74–1 and 74–2,* 1975 OK 36, ¶ 19, 534 P.2d 3 determined that the Supreme Court is not limited solely to the acts or duties of an administrative officer. If the issues are presented, the Court may consider the constitutionality of matters to be considered under the initiative and referendum process concerning procedure, form and subject matter. It may determine the constitutionality of the question if it decides that such a determination could prevent a costly and unnecessary election. The exception to *Threadgill* formulated by *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma* is grounded in the separation of powers doctrine, which prevents the Legislature from engrafting purely administrative duties upon this Court, and the inherent power of this Court, upon a proper request to grant extraordinary relief from the costly expenditure of public revenues on a needless election.[5]

¶ 10 This Court has consistently advised parties of the danger of relying on the narrow teachings of *Threadgill. In re Initiative Petition No. 349,* 1992 OK 122, ¶ 32–33, 838 P.2d 1, *cert. denied,* 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993). We said:

"Even though the proponents continue to cling to *Threadgill v. Cross,* 26 Okla. 403, 109 P. 558, 562 (1910), this Court implicitly recognized in 1975, that the *Threadgill* doctrine was frequently nothing more than a rationalization for deferring obvious issues of constitutionality. The effect of this doctrine, especially when it involves transparently unconstitutional proposals, is subject to the perception by the citizens of our state that their votes, so eagerly solicited, are ultimately meaningless acts in an elaborate charade. The danger of *Threadgill* is that, in effect, citizens may be led to believe that their votes on matters of intense public concern count, when this Court is already fully aware that the proposed measure is subject to being struck down as unconstitutional within months

---

4. Hodges, J.

5. *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma Numbered 74–1 and 74–2,* 1975 OK 36, ¶ 19, 534 P.2d 3.

should the voters approve it. Conversely, the vote on an indisputably unconstitutional measure will almost certainly be distorted by wide-spread citizen awareness of the invalidity of the measure. In any event, a truly meaningful vote on the initiative becomes impossible.

The underlying sense of our cases dating back to 1975 is that *Threadgill* trumpets a triumph of form over substance which calls into question the very legitimacy of the initiative process itself by merely postponing the inevitable. For seventeen years, the majority of this Court has understood that the *Threadgill* doctrine has been modified to the extent that it no longer operates as a bar to the pre-submission review *of constitutional defects in initiative proposals.*" [Emphasis in original.]

¶ 11 Since the promulgation of *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma,* this Court has, in at least nine cases, exercised its authority to consider patently unconstitutional measures before submission to a vote of the people. See, *In re Initiative Petition No. 366,* 2002 OK 21, ¶ 4, 46 P.3d 123; *In re Initiative Petition No. 673,* 1996 OK 129, ¶ 6, 930 P.2d 186; *In re Initiative Petition No. 362,* 1995 OK 77, ¶¶ 12–13, 899 P.2d 1145; *In re Initiative Petition No. 349,* 1992 OK 122, ¶¶ 32–22, 838 P.2d 1, *cert. denied,* 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993); *In re Initiative Petition No. 347,* 1991 OK 55, ¶ 25, 813 P.2d 1019; *In re Initiative Petition No. 341,* 1990 OK 53, ¶ 17, 796 P.2d 267; *In re Initiative Petition No. 315,* 1982 OK 15, ¶ 5, 649 P.2d 545; *In re Initiative Petition No. 317,* 1982 OK 78, ¶ 16, 648 P.2d 1207; *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma Numbered 74–1 and 74–2,* 1975 OK 36, ¶ 19, 534 P.2d 3.

¶ 12 In each of these cases, the *Threadgill* court's position on the consideration of patently unconstitutional measures is either explicitly or implicitly rejected. The majority of this Court has promulgated precedent set-

ting opinions over the course of three decades demonstrating that *Threadgill* can no longer be considered the law in Oklahoma. The propensity that *Threadgill* possesses to defer, distort, disrupt and dilute the electorate's rights at the ballot box should end.

## CONCLUSION

¶ 13 The public should be advised that this Court has not—for thirty years—and will not refrain from addressing timely viable constitutional challenges to a measure in order to prevent a costly and meaningless election— nor will inclusion of abstract constitutional challenges to possible defects result in the circumventing the right of the people to cast their votes.

¶ 14 We should do clearly what we have already done implicitly—*Threadgill v. Cross,* 1910 OK 165, 109 P. 558 should be expressly overruled. Not only must elections be orderly and contribute to the stability of government, they must not be disruptive of the elective process.[6] *Threadgill* calls into question the very legitimacy of the electoral process. It lulls the voters into a belief that their voices have been heard in the political process when, in fact, the entire process might have to be repeated should any constitutional infirmity occur. Regardless of the outcome, the electorate is entitled to closure, not overs.

**6.** *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 1392–94, 12 L.Ed.2d 506 (1964), *rehearing denied,* 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964), 379 U.S. 871, 85 S.Ct. 13, 13 L.Ed.2d 76 (1964), 379 U.S. 871, 85 S.Ct. 13, 13 L.Ed.2d 77 (1964); *Maryland Citizens for Representative General Assembly v. Governor of Maryland,* 429 F.2d 606, 609–10 (4th Cir.1970).