IN RE: INITIATIVE PETITION No. 420 STATE QUESTION No. 804



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:IN RE: INITIATIVE PETITION No. 420 STATE QUESTION No. 804

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 IN RE: INITIATIVE PETITION No. 420 STATE QUESTION No. 804
2020 OK 9
Case Number: 118405
Decided: 02/04/2020
As Corrected: February 7, 2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 9, __ P.3d __

 




IN RE: INITIATIVE PETITION No. 420, STATE QUESTION No. 804
ROGER GADDIS and ELDON MERKLIN, Petitioners,
v.
ANDREW MOORE, JANET ANN LARGENT and LYNDA JOHNSON, Respondents.

ORIGINAL PROCEEDING TO DETERMINE THE CONSTITUTIONAL VALIDITY OF INITIATIVE PETITION NO. 420, STATE QUESTION NO. 804

¶0 This is an original proceeding to determine the legal sufficiency of Initiative Petition No. 420, State Question No. 804. The petition seeks to create a new article to the Oklahoma Constitution, Article V-A, for the purpose of establishing the Citizens' Independent Redistricting Commission. The Petitioners filed this protest alleging the petition is unconstitutional because it violates the one general subject rule found in Article 24, Section 1 of the Oklahoma Constitution. They further allege its provisions violate the First Amendment of the United States Constitution. Upon our review, we hold Initiative Petition No. 420 does not violate the one general subject rule and the Petitioners have not met their burden to show clear or manifest facial constitutional infirmities. On the grounds alleged, the petition is legally sufficient for submission to the people of Oklahoma.

INITIATIVE PETITION NO. 420, STATE QUESTION NO. 804 IS
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF
OKLAHOMA

Robert G. McCampbell and Travis V. Jett, GableGotwals, Oklahoma City, Oklahoma, for Petitioners.
D. Kent Meyers, Alison M. Howard, and Melanie Wilson Rughani, Crowe & Dunlevy, Oklahoma City, OK, for Respondents.


COMBS, J.:
I. FACTS AND PROCEDURAL HISTORY
¶1 On October 28, 2019, the Respondents/Proponents, Andrew Moore, Janet Ann Largent, and Lynda Johnson (Respondents), filed Initiative Petition No. 420, State Question No. 804 (IP 420), with the Secretary of State of Oklahoma. The initiative measure proposes for submission to the voters the creation of a new constitutional article, Article V-A, which would create the Citizens' Independent Redistricting Commission (Commission). IP 420 would vest the power to redistrict the State's House of Representatives and Senatorial districts, as well as Federal Congressional Districts, in this newly created Commission.[1] IP 420 would also repeal current constitutional provisions concerning state legislative apportionment.[2] Notice of the filing was published on October 31, 2019. Title 34 O.S. Supp. 2015, § 8(b). Within 10 business days, the Petitioners, Rogers Gaddis and Eldon Merklin (Petitioners), brought this original proceeding under the authority of 34 O.S. Supp. 2015, § 8(b) to challenge the legal sufficiency of IP 420. They allege the proposed amendment by article suffers from two fatal constitutional defects: 1) IP 420 violates the single subject rule found in Okla. Const. art. 24, § 1, and 2) IP 420 violates the First Amendment of the U.S. Constitution. This matter was assigned to this office on December 17, 2019.
II. THE PROPOSED MEASURE
¶2 Sections 1 and 2 of IP 420 provide for the number of districts and terms of office for state senators and representatives. The number and terms are the same as that under current law. There will be forty-eight senate districts with only one senator from each district and one hundred and one house districts with only one representative from each district. State senators will serve a four-year term and state representatives will serve a two-year term. Section 3 vests the power to redistrict state legislative districts and federal congressional districts in the newly created Citizens' Independent Redistricting Commission. Section 4 provides for the composition of the Commission. The Commission shall consist of nine members. Three of the members shall be affiliated with the state's largest political party and three shall be affiliated with the state's second largest political party. The remaining three members are persons who are unaffiliated with either of the state's two largest political parties.
¶3 Section 4(B)(4) of IP 420 provides a mechanism for the application and selection of the nine commissioners. The Chief Justice of the Oklahoma Supreme Court shall first appoint a special master who will oversee the application process and the training of the commissioners. The Chief Justice shall also designate a Panel to review applications for the commissioner positions. The Panel is composed of three retired appellate Justices and/or Judges. Their selection is based upon a random drawing. The special master shall accept applications to the Commission. From these applications, the Panel shall identify three pools of applicants, each containing twenty applications. The three pools are composed as follows: 1) applicants affiliated with the state's largest political party, 2) applicants affiliated with the state's second largest political party, and 3) applicants not affiliated with the state's two largest political parties. Each pool shall have no fewer than three applicants from each current congressional district. As practicable, each pool shall try to reflect the state's racial, ethnic, veteran status, sexual orientation, and gender diversity. The Panel shall then choose by lot six applicants, two from each pool, to serve on the Commission. In addition, the Panel shall choose three alternate members to the Commission from the remaining pools of applicants. One is chosen from each pool by lot. Those persons will serve as alternates in order to fill vacancies on the Commission. The six commissioners will thereafter appoint one additional commissioner from each pool. Within thirty days after all redistricting plans have been approved and any challenges have been resolved, the Commission shall be dissolved and any unexpended funds shall revert to the State's general revenue fund. Section 4(H) of IP 420.
¶4 Section 4(B)(2)(a-f) of IP 420 provides for the qualifications of the commissioners. A member of the Commission shall have been continuously domiciled in this State for the five years immediately preceding the date of appointment and shall not have changed their registered political affiliation in the four years prior to such date. In addition, in the five years immediately preceding the date of appointment to the Commission, the commissioner shall not: 1) have held, or have an immediate family member who has held, a partisan elective office at the federal, state, or political subdivision level in this State, 2) have registered, or have an immediate family member who has registered, as a federal, state or local lobbyist, 3) have held office or served, or has an immediate family member who has held office or served, as a paid staff member for a political party, 4) have been nominated, nor have an immediate family member who has been nominated, as a candidate for elective office by a political party, and 5) have been an employee of the state legislature. The term "immediate family member" is defined in Section 4(A)(9) as a father, stepfather, mother, stepmother, son, stepson, daughter, stepdaughter, brother, stepbrother, sister, stepsister, husband, wife, father-in-law, or mother-in-law. Section 4(B)(6) also prohibits members from running for an elective office in a district created while they served on the Commission.
¶5 Section 4(B)(7-8) of IP 420 provides for the compensation of the members of the Commission and funding for the Commission. The commissioners' compensation consists only of a per diem amount and travel reimbursement in the same manner as members of the State Legislature. A revolving fund, the "Citizens' Independent Redistricting Commission Revolving Fund," shall be created and the Legislature is required to annually appropriate money into the fund sufficient to enable the Commission to perform its functions.
¶6 The Commission is required to vote for the appointment of a secretary who is nominated by the special master. Section 4(C) of IP 420. The duties of the secretary include: 1) assisting in the running and convening of the Commission, 2) holding regional field hearings to seek public input relevant to redistricting, 3) hiring and managing staff to assist the Commission and secretary, 4) developing and maintaining a website that creates a public plan drawing system which will allow members of the public to monitor the Commission's work as well as submit their own proposed plans and maps indicating communities of interest. Section 4(C) also includes other duties of the Commission. Part of the duties will be to obtain data from the Oklahoma Department of Corrections concerning the home addresses of state and federal inmates and add this data to the Federal Decennial Census data so that incarcerated people are counted in their home communities. Section 4(C)(3)(a) of IP 420.
¶7 Section 4(D) requires the Commission to conduct separate processes for drawing and submitting plans for the redistricting of State House Districts, State Senate Districts and Federal Congressional Districts. This subsection also provides the specific criteria the Commission will use in determining districts. First, it requires the Commission to comply with the U.S. Constitution and any federal law, including the requirement that it equalize total population. It also requires all districts to be contiguous, i.e., to be bound by an unbroken line. Additionally, the Commission shall seek to maximize compliance with the following criteria in this order of priority: 1) Communities of Interest - it shall minimize the division of communities of interest, which are defined as an area with recognized similarities of interests, which include but are not limited to, racial, ethnic, economic, social, cultural, geographic, tribal, linguistic, or historic identities, but shall not include common relationships with political parties, officeholders, or political candidates; 2) Racial and Ethnic Fairness - a redistricting plan shall not be drawn in a way to deny or abridge the equal opportunity of racial or ethnic minority groups to participate in the political process or diminish their ability to elect representatives of their choice; 3) Political Fairness -- on a statewide basis, no plan shall unduly favor a political party; 4) Districts - the districts shall respect geographic integrity of political subdivisions to the extent preceding criteria have been satisfied; and 5) Compactness -- the draft plan should be compact to the extent preceding criteria have been satisfied. In addition, a redistricting plan is prohibited from taking into consideration: 1) the residence of any member or candidate of the Oklahoma House of Representatives, Oklahoma Senate, or U.S. Congress, and 2) the political party affiliation or voting history of the population of a district.
¶8 Section 4(E) of IP 420 provides for the approval of redistricting plans. It first requires the Commission to create a preliminary plan and hold public meetings in each congressional district. A preliminary plan shall also be published, including a version in a digital format, and the public will be allowed no fewer than fourteen days to provide comment. The Commission shall then hold an open voting meeting at which time the Commission may vote to approve the plan. Six members of the Commission are required to approve a plan and out of the six, at least one member must be from each pool. Once approved, the Commission will send the plan to the State Election Board, the Governor, the Secretary of State, the Senate President Pro Tempore, the Speaker of the House and make the plan publicly available. With all preliminary and final plans, the Commission will issue a written evaluation measuring the maps against external metrics.
¶9 The Commission has one hundred and twenty days from the release of the Federal Decennial Census data to approve a final plan. If it fails to do so, then Section 4(F) of IP 420 provides a "fallback mechanism." Under this mechanism the special master shall create and submit a report to the Oklahoma Supreme Court advising the Court of the available plans. The Supreme Court shall then have thirty days to approve a plan that is consistent with the criteria provided in Section 4(D) of IP 420.
¶10 Within thirty days after a plan's approval, any aggrieved resident of this State may petition the Oklahoma Supreme Court to invalidate that plan. Section 4(G) IP 420. All petitions challenging a plan shall be consolidated. The Supreme Court has original and exclusive jurisdiction to hear and decide all such challenges to the Commission's actions and final plans. This jurisdiction, however, is limited to remedy only the specific violation alleged on the specific plan challenged. If the Court concludes the plan approved by the Commission is invalid, then it will utilize the "fallback mechanism" previously discussed.
¶11 Section 5 of IP 420 expresses the authority of the Commission. It provides, in part, that the "People declare that the powers granted to the Commission herein are legislative functions not subject to the control or approval of the Legislature, and are exclusively reserved to the Commission." It further prohibits the Legislature from establishing a body to perform functions that are the same or similar to those of the Commission. Section 6 provides for the repeal of Article V, Sections 9A, 10A, and 11A-11E of the Oklahoma Constitution. Section 7 provides a severability clause.
II. STANDARD OF REVIEW 
¶12 "The first power reserved by the people is the initiative...." Okla. Const. art. 5, § 2; In re Initiative Petition No. 409, State Question No. 785, 2016 OK 51, ¶2, 376 P.3d 250; In re Initiative Petition No. 403, State Question No. 779, 2016 OK 1, ¶3, 367 P.3d 472. With that reservation comes "the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." Okla. Cost. art. 5, § 1; In re Initiative Petition No. 409, 2016 OK 51, ¶2; In re Initiative Petition No. 403, 2016 OK 1, ¶3. "The right of the initiative is precious, and it is one which this Court is zealous to preserve to the fullest measure of the spirit and the letter of the law." In re Initiative Petition No. 382, State Question No. 729, 2006 OK 45, ¶3, 142 P.3d 400. See In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, ¶35, 838 P.2d 1. We have repeatedly emphasized both how vital the right of initiative is to the people of Oklahoma, as well as the degree to which we must protect it:
Because the right of the initiative is so precious, all doubt as to the construction of pertinent provisions is resolved in favor of the initiative. The initiative power should not be crippled, avoided, or denied by technical construction by the courts.
In re Initiative Petition No. 403, 2016 OK 1, ¶3 (quoting In re Initiative Petition No. 382, 2006 OK 45, ¶3).
¶13 However, while the fundamental and precious right of initiative petition is zealously protected by this Court, it is not absolute. Any citizen can protest the sufficiency and legality of an initiative petition. In re Initiative Petition No. 409, 2016 OK 51, ¶2; In re Initiative Petition No. 384, State Question No. 731, 2007 OK 48, ¶2, 164 P.3d 125. "Upon such protest, this Court must review the petition to ensure that it complies with the 'parameters of the rights and restrictions [as] established by the Oklahoma Constitution, legislative enactments and this Court's jurisprudence.'" In re Initiative Petition No. 384, 2007 OK 48, ¶2 (quoting In re Initiative Petition No. 379, State Question No. 726, 2006 OK 89, ¶16, 155 P.3d 32).
¶14 As to challenged initiative provisions, this Court has consistently confined our pre-election review under Section 8 of Title 34 of the Oklahoma Statutes to "clear or manifest facial constitutional infirmities." In re Initiative Petition No. 358, State Question No. 658, 1994 OK 27, ¶7, 870 P.2d 782. Challenges to the interpretation, implementation or application of an initiative proposal present nothing more than abstract questions and will not be reviewed through this Court's inherent power to grant relief from costly expenditure of public revenues on needless elections. Id. We will not interpret the contents of an initiative proposal, nor speculate its implementation at this pre-election stage. Id. ¶12. Accordingly, the Petitioners in this matter bear the burden of demonstrating the proposed initiative petition contains clear or manifest facial constitutional infirmities. See In re Initiative Petition No. 403, 2016 OK 1, ¶3; In re Initiative Petition No. 362, State Question No. 669, 1995 OK 77, ¶12, 899 P.2d 1145.
III. ANALYSIS
A. INITIATIVE PETITION 420 DOES NOT VIOLATE THE ONE GENERAL SUBJECT PROVISION FOUND IN SECTION 1 OF ARTICLE 24 OF THE OKLAHOMA CONSTITUTION.
1. The Petitioners' alleged violations of Okla. Const. art. 24, § 1. 
¶15 The Petitioners contend IP 420 violates Okla. Const. art. 24, § 1, which prohibits constitutional amendments from containing more than one general subject. This section provides in pertinent part:
No proposal for the amendment or alteration of this Constitution which is submitted to the voters shall embrace more than one general subject and the voters shall vote separately for or against each proposal submitted; provided, however, that in the submission of proposals for the amendment of this Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition. (Emphasis added).
The following is an outline of the Petitioners' arguments: 1) the redistricting of state legislative districts and federal congressional districts emanate from separate constitutional schemes and standards and are therefore separate subjects, 2) the creation of a Commission to handle redistricting is a separate subject from the procedural changes made to the redistricting process itself, 3) removing the power of the Legislature to redistrict would eliminate the power of the voters to disapprove such measures by referendum[3], and the exclusive authority of the Commission to redistrict "notwithstanding any other provisions of this Constitution" would vitiate the power of the voters to propose a redistricting measure through the initiative process - these provisions constitute a separate subject, 4) the Oklahoma Supreme Court's role in selecting the Panel and the special master as well as its new role in the line drawing process constitute a separate subject, and 5) the provision to include data concerning incarcerated people is not necessary or intertwined to the subject of redistricting.
2. This Court has consistently reviewed proposed constitutional amendments by article under a broad test.
¶16 Constitutional amendments through the initiative process, and especially through amendments by article, have been consistently reviewed by this Court under a broader test. A narrower test has been used by this Court for single subject rule analysis under Okla. Const. art. 5, § 57 for acts of the Legislature that do not amend the constitution.[4] See, e.g., Douglas v. Cox Ret. Prop., Inc., 2013 OK 37, 302 P.3d 789. Article 24 Section 1 of the Oklahoma Constitution applies only to amendments to the Oklahoma Constitution. The very wording of these constitutional sections differs; acts of the Legislature under Okla. Const. art. 5, § 57 must "embrace but one subject," however, amendments to the constitution under Okla. Const. art. 24, § 1 "shall embrace" no more than "one general subject." (Emphasis added). The word "general" is not meant to be superfluous.[5] Based upon our holding in Rupe v. Shaw, 1955 OK 223, 286 P.2d 1094, this Court held Okla. Const. art. 24, § 1 "is to receive a liberal rather than a narrow or technical construction." In re Initiative Petition No. 271, 1962 OK 178, ¶11, 373 P.2d 1017. Rupe explained that the reason for this treatment is based upon the distinction between ordinary legislation and proposed constitutional amendments. Rupe v. Shaw, 1962 OK 178, ¶6. When dealing with proposed constitutional amendments there is a "period of publicity in which those interested may acquaint themselves with the purpose of" the proposed amendment. Id.
¶17 An even more liberal review has been acknowledged by this Court when a proposal amends the constitution by article. Article 24, Section 1 of the Oklahoma Constitution provides "the voters shall vote separately for or against each proposal" and when amending by article "each proposed article shall be deemed a single proposal." (Emphasis added). In In re Initiative Petition No. 314 an initiative petition proposed to amend 5 sections of Article 27 of the Oklahoma Constitution. 1980 OK 174, 625 P.2d 595. The initiative petition did not amend by article. The proponents alleged all the amendments were under the one general subject of "control of alcoholic beverages." Id. ¶37. This Court noted there were apparent inconsistencies in the rulings of many jurisdictions concerning the single subject rule. Id. ¶56. However, these inconsistencies disappeared once you understood those decisions were based upon judgments by the courts as to whether the purposes behind the rule were offended. Id. ¶59. The purpose the Court adopted was based upon a Minnesota case, Fugina v. Donovan, 259 Minn. 35, 104 N.W.2d 911 (1960). The Supreme Court of Minnesota held the purpose behind the single subject rule was as follows:
The first is to prevent imposition upon or deceit of the public by the presentation of a proposal which is misleading or the effect of which is concealed or not readily understandable. The second is to afford the voters freedom of choice and prevent 'logrolling', or the combining of unrelated proposals in order to secure approval by appealing to different groups which will support the entire proposal in order to secure some part of it although perhaps disapproving of other parts.
In re Initiative Petition No. 314, 1980 OK 174, ¶59. In clarifying the rule we found an Arizona opinion to be on point. Id. ¶62. In Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549, 554 (1934) the Supreme Court of Arizona explained:
If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution.
We found, no matter how the courts characterized the test they apply they all examine the inherent nature of the proposed amendments to determine whether they are subjects that are separate and independent from each other so that each could stand alone, or fall as a whole, leaving the constitutional scheme harmonious and independent of the subject. In re Initiative Petition No. 314, 1980 OK 174, ¶75.
¶18 We held the subjects of alcohol-related advertising, franchising and liquor by the drink were not so interrelated and interdependent that they formed an interlocking package nor did they have a common underlying purpose. Id. None were reasonably subordinate to the other nor could it be said that any were merely incidental, supplemental or just an administrative detail to the alleged one general subject, i.e., control of alcoholic beverages. Id. In analyzing the amendments in light of the purpose of the single subject restriction, we held the proposal was misleading and constituted logrolling of the worst type. Id. ¶76. However, after coming to this conclusion, we suggested[6]:
The changes sought by the multifarious proposal could have been effected either by submission of three separate proposals or a submission amending, under Art. 24, § 1, the entirety of Art. 27, as an amendment by article, as was done in 1959 when prohibition was repealed and Art. 27 was submitted and adopted by a vote of the people.
Id. ¶81.
¶19 Several years later, a new initiative petition to propose liquor by the drink was filed. This time the proposal repealed Article 27 of the Oklahoma Constitution and replaced it with a new article which contained many of the provisions in Article 27. In re Initiative Petition No. 319, 1984 OK 23, ¶7, 682 P.2d 222. The amendments in the proposed new article included replacing the Alcoholic Beverage Control Board and authorizing liquor by the drink.[7] In re Initiative Petition No. 319, 1984 OK 23, ¶8. The protestants alleged the proposal violated the one general subject provision of Okla. Const. art. 24, § 1. They conceded all other provisions in the proposal related to the same subject, control of sale of alcoholic beverages, except for the provision authorizing liquor by the drink in state lodges (section 8 of the initiative petition). Id. We noted in our previous ruling, In re Initiative Petition No. 314, "our constitution may be amended by article under Article 24, Section 1, and that such an amendment may cover changes which would violate the single subject rule if not proposed in that format." Id. ¶9. "While the amendment is still required to relate to a single general subject, our previous ruling indicates clearly that the various changes need not meet the test which was applied in Initiative Petition No. 314, and which resulted in the invalidity of that proposal." Id. We found that "under the approach suggested" in In re Initiative Petition 314, "we could apply to this question no more restrictive test than the one approved in both Rupe v. Shaw, 286 P.2d 1094 (Okl.1955), and in In Re Initiative Petition No. 271, 373 P.2d 1017 (Okl.1962)." Id. ¶10. This Court proceeded to quote Rupe wherein we observed:
[G]enerally provisions governing projects so related as to constitute a single scheme may be properly included within the same amendment; and that matters germane to the same general subject indicated in the amendment's title, or within the field of legislation suggested thereby, may be included therein.
Id.; Rupe v. Shaw, 1955 OK 223, ¶6, 286 P.2d 1094. We also noted, Rupe included "within that rule items which were incidents, 'necessary or convenient or tending to the accomplishment of one general design notwithstanding other purposes than the main design may be thereby subserved.'" Initiative Petition No. 319, 1984 OK 23, ¶11. We concluded Initiative Petition 319 was legally sufficient for submission to a vote of the people. In re Initiative Petition No. 319, 1984 OK 23, ¶18.
¶20 After In re Initiative Petition 319, two opinions of this Court held proposed constitutional amendments by article violated Okla. Const. art. 24, § 1. In re Initiative Petition No. 342, State Question No. 628, 1990 OK 76, 797 P.2d 331 and In re Initiative Petition No. 344, State Question No. 630, 1990 OK 75, 797 P.2d 326, were decided on the same day. In both matters the initiative petitions repealed and replaced an entire article of the Oklahoma Constitution. In re Initiative Petition No. 342 repealed and replaced Article 9 of the Oklahoma Constitution concerning "Corporations" and In re Initiative Petition No. 344 repealed and replaced Article 6 of the Oklahoma Constitution concerning the "Executive Department." We used the test adopted In re Initiative Petition No. 314 from Kerby v. Luhrs[8] in both opinions, found the subject matter constituted logrolling, and held the initiative petitions embraced more than one general subject in violation of Okla. Const. art. 24, § 1.[9] In In re Initiative Petition No. 342 we determined:
There are numerous subjects covered by the Petition ranging from financial institutions holding stock in another financial institution to the power of eminent domain of foreign corporations to the fellow-servant doctrine rule. The only connection that these topics have to each other is that they all tangentially relate to the general subject of corporations. Otherwise, they are unrelated. For example, it is clear that the power of eminent domain of foreign corporations is inconsequential to the fellow-servant doctrine rule. And the prohibition against a bank holding stock in another bank is extraneous to both the power of eminent domain and the fellow-servant doctrine rule. There is no doubt that these topics do not meet the one general subject test.
1990 OK 76, ¶8; and in In re Initiative Petition No. 344 we determined:
The Petition in the present case addresses numerous subjects from the method of the election of the Lt. Governor, to changing the term of board and commission members including non-attorney members of the Judicial Nominating Commission, to giving the Governor the sole authority "to grant reprieves, commutations, and pardons", to changing the Executive Branch to a cabinet form of government, to repealing the constitutional authority for certain boards. Some of the sections in the amendment are, at best, tenuously related to other sections. The sections are not so intertwined as to require that they be adopted at the same time in order to preserve the integrity of each section. It is not necessary that all the changes be contained in the same proposal in order that the Constitution be consistent on the general topic of the Executive Branch of the government. Clearly, the placing of sole authority with the Governor to grant reprieves, commutation, and pardons is not dependent on the method of electing the Lt. Governor or a cabinet form of government. A voter supporting any one of these provisions could not reasonably be expected to support the principle of the others.
1990 OK 75, ¶9.
¶21 Six years later, this Court affirmed our amendment by article approach found in In re Initiative Petition No. 319.[10] We determined "when the proposed constitutional amendment is by a new article the test for gauging multiplicity of subjects is whether the changes proposed are all germane to a singular common subject and purpose or are essentially unrelated one to another." In re Initiative Petition No. 363, State Question No. 672, 1996 OK 122, ¶15, 927 P.2d 558.[11] When testing the germaneness of a proposed constitutional amendment "we look to whether each of its several facets bears a common concern or impacts one general object or subject." In re Initiative Petition No. 363, 1996 OK 122, ¶16. This Court also noted that the test in Rupe v. Shaw allowed provisions which were related to a single scheme and included within the single subject standard components which were incidents, "necessary or convenient or tending to the accomplishment of one general design notwithstanding other purposes than the main design may be thereby subserved." Id. n.33. We also noted the definition of "logrolling" involved the practice of embracing in one bill several distinct matters. Id. n.32. We did not find logrolling was present and we held the elements of taxability, distribution of gaming revenue and of civil liability for debts incurred in gaming were germane to the one general subject of legalization and regulation of authorized casino gaming. Id. ¶16.
¶22 The validity of the germaneness test used in Initiative Petition No. 319 and No. 363, for amendments by article, was upheld by this Court some twenty years later. In re Initiative Petition No. 403, 2016 OK 1, ¶¶5-10, 12, 367 P.3d 472. Initiative Petition No. 403 added a new Article 13-C to the Oklahoma Constitution. It created the Oklahoma Education Improvement Fund to provide for the improvement of public education in Oklahoma and an additional one-cent sales tax and use tax to fund the improvements. Id. ¶1. The funds generated were to be distributed to public school districts, higher education institutions, career and technology centers, and early childhood education providers for certain educational purposes outlined in the proposal. Id. In addition, it provided for a $5,000 pay raise to public school teachers and delegated oversight responsibilities to the State Board of Equalization to ensure the Legislature did not supplant current public education appropriations with the funds. Id. The opponents claimed the proposal violated Okla. Const. art. 24, § 1. We found the appropriate test to review the challenge was the germaneness test used in Initiative Petition No. 319 and No. 363. Id. ¶¶6-10. The subject of the initiative petition was determined to be "the Oklahoma Education Improvement Fund." Id. ¶12. Using this germaneness test, we held each section of the amendment was reasonably interrelated and interdependent, forming an interlocking package "deemed necessary by the initiatives' drafters to assure effective public education improvement funding." Id. (emphasis added). The proposal was found to be a "single scheme" that stood or fell as a whole and "each section was germane to creating and implementing the Oklahoma Education Improvement Fund." Id. Having made this determination, hypothetical examples of logrolling were found invalid, e.g., a voter may agree with the creation of the fund but disagree with the funding mechanism. Id. We held, such decisions "are the consequence of the voting process rather than any constitutional defect in the proposal." Id. The fact that a voter must choose whether to approve the proposal based upon such considerations did not constitute logrolling. Id.
¶23 The proper test to use in the review of Initiative Petition 420 is the more liberal test applicable to amendments by article. A recent opinion of this Court determined our holdings in In re Initiative Petition No. 342 and No. 344 were not in conflict with the germaneness test nor did those opinions "disavow the liberal approach taken in Rupe v. Shaw." Oklahoma Oil & Gas Ass'n v. Thompson, 2018 OK 26, ¶11, 414 P.3d 345. Initiative Petition 420 creates a new article focused on the one general subject of "redistricting." It repeals only sections concerning reapportionment. In contrast, the initiative petitions in In re Initiative Petition No. 342 and No. 344 repealed and replaced entire articles of the Oklahoma Constitution which contained matters not all germane to one another.
¶24 The Petitioners first argue the redistricting of state legislative districts is a distinct subject from redistricting of congressional districts. This argument is based upon an opinion of the Supreme Court of Colorado, In Matter of Title, Ballot Title, 2016 CO 55, 374 P.3d 460, that held redistricting provisions for state and congressional districts in an initiative petition violated Colorado's single subject restriction. However, the case was decided under Article 5, Section 1 of the Colorado Constitution which states in pertinent part: "[n]o measure shall be proposed by petition containing more than one subject. . . ." That language is essentially the same as Okla. Const. art. 5, § 57 to which we apply a more restrictive single subject test. The Colorado case is not persuasive and is inapplicable to the matter at hand.
¶25 Petitioners contend the creation of the Commission and changes made to redistricting also violate the single subject rule. Again Petitioners rely on another jurisdiction's case law. They cite to an advisory opinion of the Supreme Court of Florida which held the creation of a new redistricting commission and provisions that would change the standards applicable to the districts were two separate subjects. Advisory Opinion To Attorney Gen. re Indep. Nonpartisan Comm'n to Apportion Legislative & Cong. Districts Which Replaces Apportionment by Legislature, 926 So.2d 1218, 1225--26 (Fla. 2006). As with the Colorado opinion, the Florida opinion was decided under a narrow constitutional provision concerning single subjects. Article 9, Section 3 of the Florida Constitution provides:
The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith.
Id. at 1224. This section is also like Okla. Const. art. 5, § 57.
¶26 The one general subject of IP 420 is "redistricting." Each section of the amendment is reasonably interrelated and interdependent forming an interlocking package deemed necessary by the initiative's drafters to further the one general design of redistricting. The creation of the Commission and the exclusive powers granted to it, the criteria used to determine the districts, and all the working processes included in IP 420 to make redistricting happen are germane to each other, or at the very least, incidents, necessary or convenient or tending to the accomplishment of this one general design.[12] Having made this determination, the Petitioners' hypothetical examples of logrolling are invalid. The Petitioners assert, e.g., a voter may approve of an independent redistricting commission but have reservations on the proposed redistricting criteria. Such decisions are the consequence of the voting process rather than any constitutional defect in the proposal. In re Initiative Petition No. 403, 2016 OK 1, ¶12, 367 P.3d 472. The proposed initiative petition here is composed of a single scheme to be presented to the voters, and each section is germane to creating and implementing redistricting in Oklahoma.
B. PETITIONERS' FIRST AMENDMENT ARGUMENT AND OUR LIMITED REVIEW AT THE PRE-ELECTION STAGE.
¶27 The Petitioners assert IP 420's proposed qualifications to be a commissioner, the special master and the secretary violate the First Amendment of the United States Constitution.[13] These qualifications temporarily restrict who may participate in these positions. The restrictions include prohibiting persons who either themselves or who had an immediate family member, within the five years preceding the date of appointment, that engaged in: holding a partisan elective office, were registered as a state or federal lobbyist, was nominated as a candidate for political office, or was employed by the state legislature. Section 4 (B)(2)(a-f) of IP 420. Additionally, the prohibition includes persons who have changed their party affiliation within the last four years preceding the date of appointment. Section 4 (B)(2)(a) of IP 420.
¶28 The Petitioners note IP 420 compensates the commissioners with a per diem and travel reimbursement in the same manner as that received by members of the state legislature. Section 4 (B)(7) of IP 420. They also assume the positions of special master and secretary will be compensated.[14] The Petitioners argue that because "the First Amendment protects political association as well as political expression"[15] these qualifications constitute an unconstitutional condition of employment. The act of "conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." Rutan v. Republican Party of Illinois, 497 U.S. 62, 78 (1990).
¶29 In Elrod v. Burns, public employees of a sheriff's office brought suit alleging they were discharged or threatened with discharge solely because they were not affiliated with the same political party as the new sheriff. 427 U.S. 347, 350 (1976). The Court found that the practice of patronage dismissals "clearly infringes First Amendment interests" but the "prohibition on encroachment of First Amendment protections is not an absolute. Restraints are permitted for appropriate reasons." Id. at 360. A mere legitimate state interest would not justify such an encroachment; the government has the burden to show the "interest advanced" is "paramount," and "one of vital importance." Id. at 362. In reviewing possible interests the government would have in support of patronage, the Court noted the "need for political loyalty of employees" could be achieved by "[l]imiting patronage dismissals to policymaking positions." Id. at 367. Doing so would be "sufficient to achieve this governmental end." Id. The Court, however, held the practice of patronage dismissals was unconstitutional under the First Amendment as alleged by the respondents in that case. Id. at 373.
¶30 In 2018 the voters of Michigan passed a constitutional amendment creating Michigan's Independent Citizens Redistricting Commission for State Legislative and Congressional Districts. Daunt v. Benson, 2019 WL 6271435, *2 (W.D. Mich. Nov. 25, 2019). The Michigan Commission includes similar restrictions on commissioners as those found in IP 420. Id. at *3. Following its passage, several plaintiffs challenged the constitutional amendment and sought an injunction to prevent the selection of the commissioners. They asserted the qualification criteria prevented them from being eligible to be a commissioner in violation of their First Amendment rights. Id. at *7. The Court found the plaintiffs framed their claim within the context of "conditional hiring decisions," as in the present case, but the better framework to use for examining the constitutionality of the criteria for membership on a state redistricting commission was found in "election law cases." Id. at *13-14. In denying the injunction, the Court used the Anderson-Burdick framework and concluded the eligibility provisions did not impose severe burdens on the plaintiffs' First Amendment rights and the burdens imposed were not permanent. Id. at 14-15.
¶31 The Anderson-Burdick framework is based upon two United States Supreme Court decisions; i.e., Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992). In Timmons v. Twin Cities Area New Party, the Supreme Court explained this framework:
When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. No litmus-paper test separates those restrictions that are valid from those that are invidious. The rule is not self-executing and is no substitute for the hard judgments that must be made. (Emphasis added).
520 U.S. 351, 358-359 (citations and internal quotation marks omitted). The Daunt Court broke this down into three steps: 1) the court considers the severity of the restriction[16], 2) the court identifies and evaluates the state's interests in and justifications for the regulation, and 3) the court will assess the legitimacy and strength of those interests and determine whether the restrictions are constitutional. Daunt, 2019 WL 6271435, *14.
¶32 In 1993, an initiative petition was filed that would create term limits for Oklahoma's U.S. Representatives and Senators. In re Initiative Petition No. 360, State Question No. 662, 1994 OK 97, 879 P.2d 810. Protestants challenged its legal sufficiency. Id. ¶8. They alleged IP 360 was facially unconstitutional because it restricted voters' rights to make their own choices as to who should represent them in Congress in violation of their free speech and associational rights under the First Amendment. Id. We held such constitutional challenge was not appropriate for determination at the pre-election stage. Id. The right of the people to engage in the initiative process is precious and must be guarded; all doubt as to the construction of an initiative's pertinent provisions are to be resolved in its favor. Id. at ¶9. The authority to review such challenges at the pre-election stage is discretionary and such authority should only be used to "reach clear and manifest facial constitutional challenges at the pre[-]election stage if, in our opinion, to do so will prevent the holding of a costly and unnecessary election." Id. at ¶10. It should not be used to "reach challenges to the interpretation, implementation or application of an initiative proposal because such challenges present only abstract questions which will not be reviewed at a pre-election stage." Id. Before exercising this discretionary authority, we must always keep in mind, "the fundamental basis of the people's right to institute change and express their will through the initiative process." Id. at ¶11. We held the alleged constitutional infirmity was neither clear nor manifest nor were we convinced that a review on the merits would prevent a costly or unnecessary election. Id. In arriving at this conclusion we reiterated:
Only in the clearest cases do we believe it is essential to use the discretionary authority, and only in the clearest cases do we believe it is warranted to interfere with the people's basic right to vote on important issues by a holding of constitutional infirmity.
Id.
¶33 The Petitioners bear the burden of demonstrating the proposed initiative petition contains clear or manifest facial constitutional infirmities. Although, it is clear some people could be affected by the temporary restrictions on membership as a commissioner, special master or secretary, it is not shown that such restrictions constitute clear or manifest facial constitutional infirmities. As the Supreme Court determined in Timmons, there is no bright line that separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. 520 U.S. 351, 359 (citing Storer v. Brown, 415 U.S. 724, 730 (1974)). Nor is it clear at this stage what basis for review is appropriate, i.e., one based upon conditional hiring decisions or one based upon the Anderson-Burdick framework. Petitioners' First Amendment challenge constitutes the very type of scenario in which this Court should refrain from using its discretionary authority. Accordingly, we decline to reach this challenge at the pre-election stage.[17]
III. CONCLUSION
¶34 The people's right to propose law and amendments to the Constitution through the initiative process is precious and any doubt as to the legal sufficiency of an initiative petition should be resolved in its favor. The provisions of IP 420 are germane to the one general subject of redistricting and therefore it does not violate Okla. Const. art. 24, § 1. Nor have the Petitioners met their burden to prove it contains other clear or manifest facial constitutional infirmities. We hold, on these grounds, IP 420 is legally sufficient for submission to the people of Oklahoma.
INITIATIVE PETITION NO. 420, STATE QUESTION NO. 804 IS
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF
OKLAHOMA

¶35 Gurich, C.J., Darby, V.C.J., Kauger, Winchester, Edmondson, Combs, Kane and Rowe, JJ., Reif, S.J., concur.
¶36 Colbert, J., recused.

FOOTNOTES

[1] The Petitioners assert, unlike redistricting of the State Legislature, redistricting of the U.S. House of Representatives does not appear in the Oklahoma Constitution. Authority for establishing the Time, Places and Manner of Elections of U.S. Senators and Representatives is found in the Elections Clause of the U.S. Constitution, Article I, § 4. This section provides:
The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.
Note: the words "chuse" and "chusing" are common alternate spellings in the U.S. Constitution.
Although the Elections Clause might indicate only a state legislature may amend congressional districts, the Supreme Court of the United States has ruled the clause does not preclude a state's people from creating a commission operating independently of the legislature to establish congressional districts. Arizona State Legislature v. Arizona Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2671, 192 L. Ed. 2d 704 (2015).
The Oklahoma Statutes currently provide for the establishment of congressional districts. Title 14 O.S. 2011, § 6.1 - 6.5.

[2] Section 6 of IP 420 repeals Sections 9A, 10A, and 11A-11E of Article V of the Oklahoma Constitution. Sections 9A and 10A provide for the apportionment of State Senators and State Representatives, respectively. Sections 11A-11E grant authority to the Legislature for apportionment of the Legislature. If apportionment is not accomplished within the parameters set in these sections, then the existing Bipartisan Commission on Legislative Apportionment will fulfill this task. Qualified electors are authorized to seek review in the Oklahoma Supreme Court of any apportionment order made by the Commission. The powers of review of this Court include the approval of the apportionment order or the remanding of the matter to the Commission with directions to modify the Commission's apportionment order. If the Commission fails to timely make an apportionment order, this Court is also authorized to compel the Commission to make an apportionment.

[3] The Petitioners assert under Okla. Const. art. 5, § 1 only "act[s] of the Legislature" are subject to the referendum process.

[4] Article 5, Section 57 of the Oklahoma Constitution provides in pertinent part, "[e]very act of the Legislature shall embrace but one subject. . . . "

[5] "A statute must be read to render every part operative and to avoid rendering parts thereof superfluous or useless." Moran v. City of Del City, 2003 OK 57, ¶8, 77 P.3d 588.

[6] Note: I use the word "suggested" which is how we referred to this language in In re Initiative Petition No. 319, 1984 OK 23, ¶10, 682 P.2d 222.

[7] A summary of the topics in that initiative petition are as follows:
Section 1 provides for the creation of the Alcoholic Beverage Laws Enforcement Commission, providing for the appointment of its membership, the powers of the Commission and tenure of its members. It also prohibited members of the Commission from holding a license authorized under the new article;
Section1A provides transition procedures from the Alcoholic Beverage Control Board;
Section 2 excludes 3.2% beer and cereal malt beverages from its provisions;
Section 3 requires alcohol manufacturers to sell their products to every licensed wholesaler in the state;
Section 4 provides for restrictions on the sale of retail alcoholic beverages and also authorizes the retail sale of alcoholic beverages for on-premises consumption;
Section 5 prohibits the sale of alcohol to certain persons and restricts alcohol advertising;
Section 6 prohibits the sale of alcohol on certain days;
Section 7 provides for the taxation of alcoholic beverages and the distribution of such tax;
Section 8 prohibits state and political subdivisions from engaging in any phase of the alcoholic beverage business but authorizes, upon legislative approval, the sale of alcohol on-premises at state lodges;
Section 9 allows incorporated cities and towns to levy an occupation tax related to alcoholic beverages;
Section 10 restricts the types of entities that may hold a retail package store or wholesaler distributor license; and
Section 11 repeals art. 1, § 7 and all of art. 27 of the Oklahoma Constitution.

[8] See ¶17 of this opinion, supra; In re Initiative Petition No. 342, 1990 OK 76, ¶4; In re Initiative Petition No. 344, 1990 OK 75, ¶8.

[9] In re Initiative Petition No. 342, 1990 OK 76, ¶10; In re Initiative Petition no. 344, 1990 OK 75, ¶10.

[10] See In re Initiative Petition No. 403, 2016 OK 1, ¶9, 367 P.3d 472.

[11] The proposed amendment by article in In re Initiative Petition 363 included: the creation of four locations immediately eligible for authorized gaming, prohibited casino gaming in counties not specifically authorized for a period of five years, created a seven-member state gaming commission with authority to provide regulation and enforcement of casino gambling, provided criminal penalties for violation of gaming laws, legalized obligations incurred in the course of authorized gaming, authorized the commission to collect gaming fees from each licensed gaming facility operator, retaining the legislatively approved amount of its budget and initial operations cost, earmarked the remaining receipts for specific computer-related educational purposes, local governments, and correctional institutions. Id.

[12] In In re Initiative Petition No. 271, State Question No. 408, an initiative petition concerning reapportionment of the legislature was challenged for violating Okla. Const. art. 24, § 1. 1962 OK 178, 373 P.2d 1017. We held the proposal contained one general subject i.e., the reapportionment of the legislature. Id. ¶11. We determined the provisions on setting up a committee for enforcement and provisions on filings of candidates for legislative office were supplemental and incidental to this one general subject and did not violate Okla. Const. art. 24, § 1. Id.

[13] See ¶4 of this opinion, supra, for a complete listing of the proposed qualifications. Those same qualifications are made applicable to the special master and secretary in Sections 4 (B)(4)(a) and 4 (C)(1)(a) of IP 420, respectively.

[14] IP 420 does not specify an amount of compensation for the special master or secretary.

[15] Elrod v. Burns, 427 U.S. 347, 357 (1976) (quoting Buckley v. Valeo, 424 U.S. 1, 15 (1976).

[16] The Court determined this to be the most critical step. Daunt v. Benson, 2019 WL 6271435, *14.

[17] Although we choose not to address the Petitioners' First Amendment challenge, it is troubling that the proposed petition would appear to prohibit a person from serving as a commissioner if that person had changed their party affiliation within the last four years preceding the appointment. The appointment, by its terms, would exclude anyone who might have changed their party affiliation well prior to the enactment of the proposed amendment thus applying a retroactive restriction.




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1990 OK 75, 797 P.2d 326, 61 OBJ 1655, Initiative Petition No. 344, State Question No. 630, In re
Discussed at Length
 1990 OK 76, 797 P.2d 331, 61 OBJ 1652, Initiative Petition No. 342, State Question No. 628, In re
Discussed at Length
 1992 OK 122, 838 P.2d 1, 63 OBJ 2386, Initiative Petition No. 349, State Question No. 642, In re
Discussed
 1994 OK 27, 870 P.2d 782, 65 OBJ 886, In re Initiative Petition No. 358, State Question No. 658
Discussed
 1994 OK 97, 879 P.2d 810, 65 OBJ 2546, In Re Initiative Petition No. 360, State Question No. 662
Discussed
 1955 OK 223, 286 P.2d 1094, RUPE v. SHAW
Discussed at Length
 1962 OK 178, 373 P.2d 1017, IN RE INITIATIVE PETITION NO. 271, ST. Q. NO. 408
Discussed at Length
 1995 OK 77, 899 P.2d 1145, 66 OBJ 2313, In re Initiative Petition No. 362 State Question 669
Discussed
 2003 OK 57, 77 P.3d 588, MORAN v. CITY OF DEL CITY
Discussed
 2006 OK 45, 142 P.3d 400, IN RE: INITIATIVE PETITION NO. 382, STATE QUESTION NO. 729
Discussed at Length
 2006 OK 89, 155 P.3d 32, IN RE: INITIATIVE PETITION NO. 379
Discussed
 2007 OK 48, 164 P.3d 125, IN RE: INITIATIVE PETITION NO. 384, STATE QUESTION NO. 731
Discussed at Length
 1996 OK 122, 927 P.2d 558, 67 OBJ 3423, In re Initiative Petition No. 363, State Question No. 672
Discussed at Length
 2013 OK 37, 302 P.3d 789, DOUGLAS v. COX RETIREMENT PROPERTIES, INC.
Discussed
 2016 OK 1, 367 P.3d 472, IN RE INITIATIVE PETITION NO. 403 STATE QUESTION NO. 779
Discussed at Length
 2016 OK 51, 376 P.3d 250, IN RE INITIATIVE PETITION NO. 409, STATE QUESTION NO. 785
Discussed at Length
 2018 OK 26, 414 P.3d 345, OKLAHOMA OIL & GAS ASSOC. v. THOMPSON
Discussed
 1980 OK 174, 625 P.2d 595, Initiative Petition No. 314, In re
Discussed at Length
 1984 OK 23, 682 P.2d 222, Initiative Petition No. 319, State Question No. 563, In re
Discussed at Length
Title 14. Congressional and Legislative Districts
 Cite
Name
Level

 14 O.S. 6.1, Short Title
Cited
Title 34. Initiative and Referendum
 Cite
Name
Level

 34 O.S. 8, Filing Copy of Proposed Petition - Publication - Protest - Hearing and Determination - Signature Gathering Deadline
Discussed


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA