OSCN Found Document:IN RE INITIATIVE PETITION NO. 448, STATE QUESTION NO. 836; THE OKLAHOMA REPUBLICAN PARTY, et. al. v. SETTER, et. al.

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 IN RE INITIATIVE PETITION NO. 448, STATE QUESTION NO. 836; THE OKLAHOMA REPUBLICAN PARTY, et. al. v. SETTER, et. al.
2025 OK 56
Case Number: 123007
Decided: 09/16/2025
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2025 OK 56, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

In re INITIATIVE PETITION NO. 448, STATE QUESTION NO. 836: THE OKLAHOMA REPUBLICAN PARTY and RONDA VUILLEMONT-SMITH,
Protestants/Petitioners,
v.
KENNETH RAY SETTER, YVONNE GALVAN, and ANTHONY STOBBE,
Proponents/Respondents.

ORIGINAL PROCEEDING TO PROTEST INITIATIVE PETITION

¶0 This is an original proceeding to determine the legal sufficiency of Initiative Petition No. 448, State Question No. 836 (hereinafter "IP 448"). IP 448 seeks to repeal Article III, Section 3 of the Oklahoma Constitution that currently governs Oklahoma's primary elections and to create a new primary system in its place under the proposed constitutional amendment that creates Article III-A in the Oklahoma Constitution. According to the Proponents/Respondents' gist, IP 448 "would establish an 'open primary' system" in which "all candidates for a covered office would appear on the same primary ballot without regard to party affiliation, and any qualified voter could vote for any candidate without regard to party affiliation. A voter in the open primary could vote for only one candidate per covered office. The two candidates receiving the most votes in the open primary would advance to the general election, without regard to party affiliation and without regard to whether the candidates have been nominated or endorsed by any political party." Pet'rs' App. at p.A5, Gist. The gist goes on to provide that "[i]n all elections for covered offices, . . . candidates' political party registration or independent status as of the date of candidate filing would appear on the ballot next to their names[,] and the ballot would state that a candidate's indicated party registration does not imply the candidate is nominated or endorsed by the political party." Id. The Protestants/Petitioners filed this protest pursuant to 34 O.S.2024, § 8

INITIATIVE PETITION NO. 448, STATE QUESTION NO. 836
IS LEGALLY SUFFICIENT FOR GATHERING OF SIGNATURES

For Protestants/Petitioners.

Trevor Pemberton
Pemberton Law Group
Oklahoma City, Oklahoma; and

Benjamin P. Sisney and Nathan J. Moelker
American Center for Law and Justice
Washington, D.C.

For Proponents/Respondents.

Robert G. McCampbell
GableGotwals, PC
Oklahoma City, Oklahoma;

Amelia A. Fogleman
GableGotwals, PC
Tulsa, Oklahoma;

Melanie Wilson Rughani
Crowe & Dunlevy, P.C.
Oklahoma City, Oklahoma; and

Frederic Dorwart
Frederic Dorwart, Lawyers PLLC
Tulsa, Oklahoma

 

COMBS, J.:

I. FACTS AND PROCEDURAL HISTORY

¶1 On January 3, 2025, Kenneth Ray Setter, Yvonne, Galvan, and Anthony Stobbe (hereinafter "Proponents") filed IP 448 with the Secretary of State pursuant to 34 O.S.2024, § 834 O.S.2024, § 8

II. THE PROPOSED MEASURE

¶2 As previously indicated, IP 448 would add a new Article III-A to the Oklahoma Constitution, composed of eight sections. Section 1 of IP 448 is captioned "APPLICATION" and spells out the scope of the elections affected by Article III-A. Pet'rs' App. at p.A3, Initiative Petition § 1. It provides that Article III-A "shall govern the process for primary and general elections for . . . statewide offices, county offices, district attorney, members of the state legislature, and members of the United States Congress," but not elections for "the office of Presidential Elector, municipal offices, judicial offices, school board members, or any other office not specified herein as a 'covered office.'" Id. Section 2 is captioned "OPEN PRIMARIES" and spells out a new process for primary elections for covered offices. Id., Initiative Petition § 2(A). Under the new process, all candidates for a covered office--whether affiliated or unaffiliated with, endorsed by, or nominated by a political party--will appear on the same primary ballot that every qualified voter receives. Id. Every voter may vote for one candidate appearing on the primary ballot, and the two candidates receiving the most votes will advance to appear on the general election ballot. Id., Initiative Petition § 2(B)--(C). Section 3 is captioned "GENERAL ELECTIONS" and repeats that the top two vote-getters from the primary will advance to the general election ballot, but it also gives the Legislature leave to enact statutes governing exigencies that may arise, such as the death, withdrawal or disqualification of a candidate who has advanced to the general election. Id. at A3--A4, Initiative Petition § 3. Section 4 is captioned "THE BALLOT" and specifies that, on ballots for both primaries and general elections, "[c]andidates shall appear . . . in a randomized order" and that "each candidate's political party of registration or independent status as of the date of candidate filing" will be listed next to their names, along with a disclaimer "informing voters that a candidate's indicated party registration does not imply that the candidate is nominated or endorsed by the political party or that the party approves of or associates with that candidate." Id. at A4, Initiative Petition § 4(A)--(B). Section 5 is captioned "REPEALER" and revokes the constitutional amendment to Article III, section 3 of the Oklahoma Constitution adopted in 1978, but preserves provisions therein requiring candidates for the office of Presidential Elector to be either nominated by the recognized political parties at their convention or, if nonpartisan, placed on the ballot by citizens' petition. Id., Initiative Petition § 5(A)--(B). Section 6 of IP 448 is captioned "SEVERABILITY" and provides that in the event any part or provision of the proposed Article III-A is "held void, invalid, or unconstitutional, the decision of the court so holding shall not affect or impair any of the remaining parts or provisions [t]hereof," which "shall continue in full force and effect." Id., Initiative Petition § 6. Section 7 is captioned "MISCELLANEOUS" and specifies that the same procedures governing primary and general elections "shall apply to special elections for covered offices," that any provision of law found inconsistent with Article III-A is "expressly declared null and void," and that "[t]he Legislature may enact legislation to facilitate the operation" of Article III-A but cannot enact any law to "limit, restrict or conflict with the provisions" of Article III-A. Id., Initiative Petition § 7. Finally, section 8 is captioned "EFFECTIVE DATE" and specifies that Article III-A will take effect 90 days after the date of its approval by the People, but will not apply to any election for which the filing period has already begun prior to the effective date.

¶3 The gist and the ballot title for IP 448 are nearly identical. Below is the language of the gist:

The gist of the proposition is:

This initiative, which would add a new Article 3A to the Oklahoma Constitution, would establish an "open primary system, as set forth therein, for elections for certain offices. In the open primary, all candidates for a covered office would appear on the same primary ballot without regard to party affiliation, and any qualified voter could vote for any candidate without regard to party affiliation. A voter in the open primary could vote for only one candidate per covered office. The two candidates receiving the most votes in the open primary would advance to the general election, without regard to party affiliation and without regard to whether the candidates have been nominated or endorsed by any political party. If only two candidates for a covered office qualify to appear on the ballot, then those candidates would automatically advance to the general election. The legislature could create a procedure to follow if a candidate will not participate in the general election due to death, withdrawal, or disqualification. In all elections for covered offices, candidates, candidates would appear on the ballot in randomized order; candidates' political party registration or independent status as of the date of candidate filing would appear on the ballot next to their names; and the ballot would state that a candidate's indicated party registration does not imply the candidate is nominated or endorsed by the political party. The initiative would repeal Article 3, Section 3 of the Oklahoma Constitution, except that candidates for Presidential Elector would continue to be nominated by the recognized political parties at their conventions, and citizens could by petition continue to place the names of independent candidates on the ballot for that office. The initiative provides for severability and an effective date. Further details are provided in the attached petition.

 

Pet'rs' App. at p.A5, Gist. For reasons spelled out later in this opinion, the language of Proponents' proposed ballot title does not need to be set forth in its entirety. See infra-Part IV.C.

III. STANDARD OF REVIEW

¶4 "The first power reserved by the people is the initiative . . . ." Okla. Const. art. V, § 2; Gaddis v. Moore (In re Initiative Pet. No. 420, State Question No. 804), 2020 OK 9458 P.3d 1088Okla. Grocers Ass'n v. Retail Liquor Ass'n of Okla. (In re Initiative Pet. No. 409, State Question No. 785), 2016 OK 51376 P.3d 250OCPA Impact, Inc. v. Sheehan (In re Initiative Pet. No. 403, State Question No. 779), 2016 OK 1367 P.3d 472Gaddis, 2020 OK 9Okla. Grocers Ass'n, 2016 OK 51OCPA Impact, Inc., 2016 OK 1Gaddis, 2020 OK 9Okla. Prof'l Econ. Dev. Council, Inc. v. Carpenter (In re Initiative Pet. No. 382, State Question No. 729), 2006 OK 45142 P.3d 400Feldman v. Okla. Coal. to Restrict Abortion, Inc. (In re Initiative Pet. No. 349, State Question No. 642), 1992 OK 122838 P.2d 1

Because the right of the Initiative is so precious, all doubt as to the construction of pertinent provisions is resolved in favor of the initiative. The initiative power should not be crippled, avoided, or denied by technical construction by the courts.

Gaddis, 2020 OK 9OCPA Impact, Inc., 2016 OK 1Carpenter, 2006 OK 45

¶5 However, while the fundamental and precious right of initiative petition is zealously protected by this Court, it is not absolute. Gaddis, 2020 OK 9Bailey v. Carpenter (In re Initiative Pet. No. 379, State Question No. 726), 2006 OK 89155 P.3d 32In re Initiative Pet. No. 9 of Okla. City, 1939 OK 23890 P.2d 665Whitson v. City of Kingfisher, 1936 OK 9754 P.2d 61634 O.S.2024, § 8Gaddis, 2020 OK 9Okla. Grocers Ass'n, 2016 OK 51Ballard v. First Class Educ. for Okla. (In re Initiative Pet. No. 384, State Question No. 731), 2007 OK 48164 P.3d 125Gaddis, 2020 OK 9Ballard, 2007 OK 48Bailey, 2006 OK 89

¶6 As to initiative provisions being challenged as unconstitutional, this Court has consistently confined our pre-election review under 34 O.S.2024, § 8clear or manifest facial constitutional infirmities." Gaddis, 2020 OK 9Burrows v. Okla. Best, Inc. (In re Initiative Pet. No. 358, State Question No. 658), 1994 OK 27870 P.2d 782Id. ¶ 14, 458 P.3d at 1094 (citing OCPA Impact, Inc., 2016 OK 1Barby v. Oklahomans for Prop. Tax Reform (In re Initiative Petition No. 362, State Question No. 669), 1995 OK 77899 P.2d 1145

¶7 Regarding challenges to the sufficiency of the gist, the relevant yet brief statutory provision is found in title 34, section 3 of the Oklahoma Statutes:

. . . A simple statement of the gist of the proposition shall be printed on the top margin of each signature sheet. 

34 O.S.2024, § 3Ballard, 2007 OK 48See generally Act of July 23, 1985, ch. 288, § 1, 1985 Okla. Sess. Laws 1248, 1248.

¶8 Despite the brevity of its language and its existence, over the past forty years this Court has generated a considerable body of jurisprudence that fleshes out the statutory requirement of a gist. In our first batch of cases reviewing the gists of several initiative petitions filed in 1990, we observed that the gist, a/k/a "[t]he statement on the Petition[,] should be sufficient that the signatories are at least put on notice of the changes being made." In re Initiative Petition No. 342, State Question No. 628, 1990 OK 76797 P.2d 331In re Initiative Petition No. 344, State Question No. 630, 1990 OK 75797 P.2d 326Ballard, 2007 OK 48Parker v. S.T.O.P. New Taxes (In re Petition No. 347, State Question No. 639), 1991 OK 55813 P.2d 1019Okla. Grocers Ass'n, 2016 OK 51Ballard, 2007 OK 48In re Initiative Petition No. 342, 1990 OK 76Okla. Grocers Ass'n, 2016 OK 51Ballard, 2007 OK 48In re Initiative Petition No. 342, 1990 OK 76Cmty. Gas & Serv. Co. v. Walbaum, 1965 OK 118404 P.2d 1014Newberry v. Moore (In re Initiative Petition No. 420, State Question No. 804), 2020 OK 10458 P.3d 1080Okla. Grocers Ass'n, 2016 OK 51But see Tay v. Green, 2022 OK 38509 P.3d 615

¶9 For reasons that will become clear later, the standard for review relating to ballot titles does not need to be recited at this juncture. See infra-Part IV.C.

IV. ANALYSIS

A. IP 448 Does Not Violate the U.S. Constitution's First Amendment Right of Association

¶10 Protestants primarily challenge the facial constitutionality of IP 448, arguing it is unconstitutional insofar as it violates the U.S. Constitution's First Amendment right to associate and fails to pass strict scrutiny. AAOJ ¶¶ 18--67, at 5--14. Before delving into the specifics of their argument, we need to unpack their statement that the First Amendment contains a right of association and familiarize ourselves with some U.S. Supreme Court precedents regarding that right in relation to primary elections.

¶11 The text of the First Amendment in the Bill of Rights states, "Congress shall make no law respecting an establishment of Religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I. The text itself does not mention the word "associate" or "association." Nevertheless, U.S. Supreme Court precedent recognizes that the First Amendment rights to expression and assembly give rise to a right of association, particularly when it comes to association within a political party in light of the Fifteenth Amendment right to vote. See Williams v. Rhodes, 393 U.S. 23, 30--31 (1968). Thus, "freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments," and "[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." Kusper v. Pontikes, 414 U.S. 51, 56--57 (1973) (citations omitted); accord Cal. Democratic Party v. Jones, 530 U.S. 567, 574 (2000); Tashjian v. Republican Party of Conn., 479 U.S. 208, 214 (1986); Democratic Party of the U.S. v. Wisconsin ex rel. La Follette, 450 U.S. 107, 121--22 (1981). The freedom to associate "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only," La Follette, 450 U.S. at 122, which "is to say, a corollary of the right to associate is the right not to associate," Jones, 530 U.S. at 574.

¶12 States are generally granted broad power to control the election process for state offices, as states have a substantial interest in the manner in which elections are conducted. See La Follette, 450 U.S. at 126. The State's power, however, is not absolute and may not be exercised in a manner which violates the Constitution. Specifically, the State must observe the limits established by the First Amendment rights of its citizens, including the freedom of political association. Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451 (2008). In this regard, "[e]lection regulations that impose a severe burden on associational rights are subject to strict scrutiny" and will be upheld only if a compelling state interest can justify a narrowly tailored limitation of First Amendment freedoms. Id. On the other hand, "[i]f a statute imposes only modest burdens, . . . then 'the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures. Id. at 452 (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)). The U.S. Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." Id. (quoting Burdick v. Takushi, 504 U.S. 428, 438 (1992)).

¶13 There are three relevant U.S. Supreme Court precedents concerning state regulation of primary elections that implicates the right to associate.

¶14 In Democratic Party of the United States v. Wisconsin ex rel. La Follette, 450 U.S. 107 (1981), the charter of the National Democratic Party was at odds with Wisconsin election laws with respect to choosing delegates. The National Democratic Party's charter provided that delegates to its national convention were to be chosen in a procedure where only Democrats could participate, whereas Wisconsin law allowed delegates to be chosen through a process in which voters did not declare their party affiliation--meaning any voter could vote in the democratic primary, and chosen delegates were bound to vote for the nominee in accordance with the open primary results. Id. at 109. Wisconsin sought declaratory relief and prevailed in the state court system, but on certiorari the U.S. Supreme Court held that the freedom of association necessarily presupposes the freedom to identify those who constitute the association, and a "political party's choice among the various ways of determining the makeup of a state's delegation to the party's national convention is protected by the Constitution." Id. at 124.

¶ 15 In California Democratic Party v. Jones, 530 U.S. 567 (2000), the Court addressed California's change in selection of party nominees from a closed primary to a "blanket" primary in which each voter's ballot (regardless of party) listed every candidate regardless of party affiliation and in which voters could choose freely among all candidates. The candidate of each party with the most votes would be chosen as that party's nominee for the general election. In an 7-2 opinion authored by Justice Antonin Scalia, the Supreme Court recognized that states have a major role in the election process--including structuring the primaries--but that, when a state regulates the political party's "internal processes," the state must abide by the Constitution. Id. at 572-73. The Court stated: "In no area is the political association's right to exclude more important than in the process of selecting its nominee." Id. at 575. The Court found that the blanket primary system violated these principles, because of the prospect of having a nominee determined by voters of the opposite party and those with opposite views. See id. at 578. The Court further found that California's articulated compelling interests of producing elected officials who better represent the electorate, of expanding candidate debate beyond the scope of partisan concerns, of ensuring minority voters the right to enjoy an effective vote, of promoting fairness, of affording greater choice to voters, of increasing voter participation, and of protecting privacy were not narrowly tailored to further these interests. See id. at 585.

¶16 In doing so, the Court observed California could further these interests without burdening a party's First Amendment rights by conducting what it called a "nonpartisan blanket primary," where the state would determine the qualifications of the candidates and then:

Each voter, regardless of party affiliation, may then vote for any candidate, and the top two vote getters (or however many the State prescribes) then move on to the general election. This system has all the characteristics of the partisan blanket primary, save the constitutionally crucial one: Primary voters are not choosing a party's nominee. Under a nonpartisan blanket primary, a State may ensure more choice, greater participation, increased "privacy," and a sense of "fairness"--all without severely burdening a political party's First Amendment right of association.

Id. at 585-86 (emphasis added).

¶17 In Washington State Grange v. Washington State Republican Party, 552 U.S. 442 (2008), Washington had initially adopted a "blanket" primary system nearly identical to the system deemed unconstitutional in Jones. After the U.S. Court of Appeals invalidated Washington's first system in light of the U.S. Supreme Court's holding in Jones, Washington voters passed an initiative petition (I-872) adopting a primary system much like the one described in Jones's dictum, providing:

That candidates for office shall be identified on the ballots by their self-designated "party preference"; that voters may vote for any candidate; and that the two top votegetters for each office, regardless of party preference, advance to the general election.

Id. at 444. The State Republican Party challenged the law, arguing it violated the Party's associational rights "by usurping its right to nominate its own candidates and by forcing it to associate with candidates it does not endorse." Id. at 448. In a 7-2 opinion authored by Justice Clarence Thomas, the U.S. Supreme Court rejected this argument as flawed. After discussing the precedential tenets relating to the constitutional protection of political associational rights, the Court held the initiative did not impose a severe burden on the Party because, unlike the California law struck down in Jones, the Washington initiative "does not, by its terms, choose the parties' nominees." Id. at 453. "The essence of nomination--the choice of a party representative--does not occur under I-872" because "[t]he top two candidates from the primary election proceed to the general election regardless of their party preferences." Id. Because the initiative did not impose any severe burden on the Party's associational rights, the Court reasoned, Washington need not assert a compelling state interest, and its interest in providing voters with relevant information about candidates was "easily sufficient" to uphold the initiative as consistent with the First Amendment. Id. at 458.

¶18 Protestants want to liken this case to Jones and distinguish Washington State Grange. They attempt to do so by arguing that, whereas Washington State Grange approved I-872's requirement that the ballot list "party preference" next to the candidates' names, IP 448 requires the ballot to list "party registration," which Protestants contend is the same as "party association" and "affiliation." AAOJ ¶¶ 54--55, at 11. Protestants further argue that IP 448 undermines their political party's message and forces the Republican Party of Oklahoma "to embrace views (and, here candidates) it does not wish to embrace." Id. ¶ 32, at 7. Finally, Protestants argue that candidates who proceed to the general election "effectively becom[e] a de facto party nominee without the party's consent and without regard to its platform." Id. ¶ 53, at 11.

¶19 Regarding the first argument, there's no meaningful difference between "party registration" and "party preference." Protestants' latter two arguments were advanced by the Washington Republican Party in the Washington State Grange case and squarely rejected. 552 U.S. at 452--54. IP 448 does not refer to candidates as nominees, it does not treat them as such, and the top two candidates proceed to the general election without regard to party affiliation. Moreover, we have faith in Oklahoma's electorate to read the disclaimer required by Section 4 of IP 448, much like the U.S. Supreme Court had faith in Washington's electorate to know the difference between a candidate's party preference and party endorsements. See Washington State Grange, 552 U.S. at 454.

¶20 Washington State Grange remains directly on point. IP 448 does not impose any severe burden on Protestants' associational rights. Proponents' asserted interests in allowing independent voters to participate, in electing the most popular candidates, in gaining efficiency, in increasing voter participation and turnout, in providing voters with greater choice, and in promoting fairness is sufficient to pass constitutional muster. We do not find any clear or manifest facial constitutional infirmities in the proposed measure. We therefore deem IP 448 legally sufficient with respect to Protestants' pre-election constitutional challenge.

B. IP 448's Gist Is Not Misleading.

¶21 Protestants set forth two arguments for why they believe the suggested ballot title and gist are misleading. For reasons discussed below, see infra Part IV.C, we need not consider such arguments with respect to the ballot title at this stage.

¶22 First, they argue the gist "mislead[s] the reader about IP 448's nature" because it "frame[s] IP 448 as creating a so-called 'open' primary system" when in reality IP 448 "creates a 'blanket primary' variant." Protestants' Br. in Supp. 2, 13; see also AAOJ ¶¶ 9, 68, at 3, 14 (containing nearly identical language). Protestants provide us with quotations from U.S. Supreme Court precedents that define that term and contrast it with an open primary:

A "'blanket primary' refers to a system in which 'any person, regardless of party affiliation, may vote for a party's nominee.'" Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 445 n.1 (2008) (quoting Cal. Democratic Party v. Jones, 530 U.S. 567, 576 n.6 (2000)). To be clear, "[a] blanket primary is distinct from an 'open primary,' in which a person may vote for any party's nominees, but must choose among that party's nominees for all offices." Id. (citation omitted).

. . . .

In a true open primary, "all registered voters may choose in which party primary to vote," then that voter may only vote among that party's candidates in that election. Tashjian v. Republican Party, 479 U.S. 208, 222 n.11 (1986). IP 448 is not that. Instead, IP 448 provides that a voter would receive a single ballot and that "all candidates for a covered office would appear on the same primary ballot without regard to party affiliation, and any qualified voter could vote for any candidate without regard to party affiliation." Suggested Ballot Title, IP 448; (App. A-3 (emphasis added).

Br. in Supp. 2--3; AAOJ ¶¶ 9, 11, at 3--4. Protestants argue that the "'open primary' system" referenced in the first sentence of the gist "does not meet the U.S. Supreme Court's definition of an open primary." Br. in Supp. 3; AAOJ ¶ 13, at 4. Protestants conclude that Proponents use of "open primary" to describe a "blanket primary" is "mislead[ing] [to] the reader about IP 448's nature." Br. in Supp. 13; AAOJ ¶ 68, at 14.

¶23 Proponents respond by arguing that Protestants "rely solely on the fact that the Supreme Court has used the term [i.e., "open primary"] 24 years ago [i.e., in the case of California Democratic Party v. Jones, 530 U.S. 567 (2000),] to describe a system that differs from IP 448. But voters need not refer to any external source because the gist (and the attached petition) fully explains the IP 448 process." Resp'ts' Br. in Opp'n 14 (citation and footnote omitted). Proponents contend that the term "open primary" has been used to describe primary systems like that proposed in IP 448, as demonstrated in several cases from Alaska, California, and Idaho. Id. at 14 n.11 (citing Kohlhaas v. State, 518 P.3d 1095, 1105 (Alaska 2022); Rubin v. Padilla, 183 Cal. Rptr. 3d 373, 383 (Ct. App. 2016); Field v. Bowen, 131 Cal. Rptr. 3d 721, 724 (Ct. App. 2011); Idahoans for Open Primaries v. Labrador, 533 P.3d 1262, 1268 (Idaho 2023)).

¶24 We find the gist is not misleading insofar as it uses the term "open primary" to describe a primary system that the U.S. Supreme Court has previously labeled a "non-partisan blanket primary." The primary system being proposed is sufficiently described in detail within the gist. Potential signatories who read the gist should not be confused or misled by any label. The Proponents could choose any label they want, so long as their gist proceeds to define what they mean by that term. Here, they've chosen the label "open primary," and their gist proceeds to define exactly what they mean by that term.

¶25 Second, Protestants argue the gist is misleading because it "fail[s] to clearly state IP 448's changes to the general election ballot," or at least doesn't do so until "well into the text." Br. in Supp. 13; AAOJ ¶¶ 68, 71--72, at 14--15.

¶26 Proponents respond that the gist clearly informs the reader about the impact on general elections in its fourth sentence: "The two candidates receiving the most votes in the open primary would advance to the general election without regard to party affiliation and without regard to whether the candidates have been nominated or endorsed by any political party." Resp'ts' Br. in Opp'n 14--15. They contend this explanation is explicit and "far from 'buried.'" Id. at 15. We agree with Proponents that the gist makes it clear IP 448 makes changes to the general election ballot. Consequently, the gist is not misleading and is therefore legally sufficient.

C. Protestants' Challenge to the Ballot Title is Premature.

¶27 Protestants argue the ballot title is misleading for the same two reasons they believe the gist is misleading. We find any challenge to the ballot title at this stage of the process is premature.

¶28 In 2015 the Legislature amended 34 O.S.2011, §§ 8after the signature-gathering phase. For example, section 8 was amended, in part, as follows:

Section 8. A. When a citizen or citizens desire to circulate a petition initiating a proposition of any nature, whether to become a statute law or an amendment to the Constitution, or for the purpose of invoking a referendum upon legislative enactments, such citizen or citizens shall, when such petition is prepared, and before the same is circulated or signed by electors, file a true and exact copy of same in the office of the Secretary of State and_shall_at_the_same_time_file_a_separate_ballot_title,_which_shall_not_be_part_of_or_printed_on_the_petition.

B. It shall be the duty of the Secretary of State to cause to be published, in at least one newspaper of general circulation in the state, a notice of such filing and the apparent sufficiency or insufficiency of the petition. Such publication shall include the text of the ballot title as reviewed or, if applicable, as rewritten, by the Attorney General pursuant to the provisions of subsection D of Section 9 of this title, and shall include notice that any citizen or citizens of the state may file a protest as to the constitutionality of the petition, by a written notice to the Supreme Court and to the proponent or proponents filing the petition, or as to the ballot title as provided in Section 10 of this title. Any such protest must be filed within ten (10)_business days after publication. A copy of the protest shall be filed with the Secretary of State.

. . . .

H. I._Upon order of the Supreme Court it shall be the duty of the Secretary of State to forthwith cause to be published, in at least one newspaper of general circulation in the state, a notice of the filing of the "signed petitions" and the apparent sufficiency or insufficiency thereof,_and_shall_also_publish_the_text_of_the_ballot_title_as_reviewed_and_approved_or,_if_applicable,_as_rewritten_by_the_Attorney_General_pursuant_to_the_provisions_of_subsection_D_of_Section_9_of_this_title and notice that any citizen or citizens of the state may file an objection to the count made by the Secretary of State, by a written notice to the Supreme Court and to the proponent or proponents filing the petition. Any such objection must be filed within ten (10)_business days after publication and must relate only to the validity or number of the signatures_or_a_challenge_to_the_ballot_title. A copy of the objection to the count or ballot title shall be filed with the_Supreme_Court,_the_Attorney_General_and_the Secretary of State, and notice shall also be given to the Secretary of State.

Act of Mar. 9, 2015, ch. 193, § 4, 2015 Okla. Sess. Laws 635, 637--38 (codified at 34 O.S.Supp.2015, § 8business days after the same is published by the Secretary of State as provided for in subsection B_I of Section 8 of this title, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. . . ." ch. 193, § 6, 2015 Okla. Sess. Laws at 640 (codified at 34 O.S.Supp.2015, § 10

¶29 These amendments served as the basis for our observation in Oklahoma Grocers Association v. Retail Liquor Association of Oklahoma (In re Initiative Petition No. 409, State Question No. 785), 2016 OK 51376 P.3d 2502016 OK 51Tay v. Malone (In re State Question No. 813, Initiative Petition No. 429), 2020 OK 79476 P.3d 4712020 OK 79See 34 O.S.2024, § 9id. § 8(I) (acknowledging the Attorney General's ability to rewrite the ballot title); id. § 10(A) (giving the Supreme Court, contingent upon an appeal being filed by a protestant, the power to "correct or amend the ballot title before the court, or [to] accept the substitute suggested, or . . . [to] draft a new one which will conform to the provisions of Section 9 of this title"). Protestants' challenge to the ballot title of IP 448 is premature.

V. CONCLUSION

¶30 The People's right to propose law and amendments to the Oklahoma Constitution through the initiative process is precious, and any doubt as to the legal sufficiency of an initiative petition should be resolved in its favor. Protestants have not met their burden to prove IP 448 contains any clear or manifest facial constitutional infirmities. Nor have they demonstrated the gist is misleading. Their challenge to the proposed ballot title is premature at this stage. We therefore hold, on these grounds, that IP 448 is legally sufficient for submission to the People of Oklahoma for signatures.

INITIATIVE PETITION NO. 448, STATE QUESTION NO. 836
IS LEGALLY SUFFICIENT FOR GATHERING OF SIGNATURES

ROWE, C.J., and WINCHESTER, EDMONDSON, COMBS, GURICH, and DARBY, JJ., concur.

KUEHN, V.C.J. (by separate writing); KANE, J.; and BELL, S.J., concur in part and dissent in part.

JETT, J., recused.

FOOTNOTES

See In re State Question No. 832, Initiative Pet. No. 446, 2024 OK 60558 P.3d 19see also id. ¶ 1, 558 P.3d at 20--21 (Combs, J., concurring specially).

 

 

KUEHN, V.C.J., with whom BELL, S.J., joins, CONCURRING IN PART, DISSENTING IN PART:

¶1 I agree with the Majority that Initiative Petition 448 should go to a vote of the people. I disagree with the decision to determine whether the Petition itself violates the Oklahoma Constitution.

¶2 In State Chamber of Oklahoma v. Cobbs I explained that Title 34 and the Oklahoma Constitution, read together, do not give this Court the authority to determine the constitutionality of the merits of any initiative petition before it is put to a vote of the people. State Chamber of Oklahoma v. Cobbs, 2024 OK 13545 P.3d 1216Id. ¶ 3, 545 P.3d at 1216. In 1975, we decided we could intervene where a determination of constitutionality on the merits "could prevent a costly and unnecessary election." Id., quoting In re Supreme Court Adjudication of Initiative Petitions in Norman, Okla. Numbered 74-1 and 74-2, 1975 OK 36534 P.2d 3Id., quoting In re Initiative Petition No. 347, State Question No. 639, 1991 OK 55813 P.2d 1019In re Initiative Petition No. 358, State Question No. 658, 1994 OK 27870 P.2d 782Cobbs, this self-imposed limitation is remarkably poorly defined in our cases. Cobbs, 2024 OK 13Id. ¶ 13, 545 P.3d at 1219.

¶3 Article 2, Section 1 of the Oklahoma Constitution's Bill of Rights provides:

All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided, such change be not repugnant to the Constitution of the United States.

Okla. Const. art. 2, § 1. That is, the default position is that the people may generally propose and vote on changes in statutes and the Constitution -- the mechanisms of government. I believe this Court has lost its way because it misunderstands the requirement that any petition put forward by the people not be repugnant to the Constitution. And that misunderstanding led this Court to manufacture its "clear and manifest" standard, which is neither stated nor implied in the constitutional language quoted above.

¶4 What does it mean, to be repugnant to the Constitution? Repugnant is a very strong word, now "relatively rare in legal discourse." Noah Feldman, The Voidness of Repugnant Statutes: Another Look at the Meaning of Marbury, 148 Proc. Am. Phil. Soc'y 27, 31 (2004). Colloquially, we might think something repugnant is unpleasant or offensive. However, as a legal term of art its meaning is very different. A statute or provision is repugnant if it is "Inconsistent or irreconcilable with; contrary or contradictory to. . . . '[N]ot legally and logically possible of existing simultaneously.' " Repugnant, Black's Law Dictionary (12th Ed. 2024) (quoting McElrath v. Georgia, 601 U.S. 87 (2024)). This applies to clauses within the same document or two documents compared to one another. For centuries "repugnant" has been used in English law to describe situations where laws were contrary, where there was a problematic relationship between laws, and especially where a law was problematic in relation to already controlling law. Mary Sarah Bilder, The Corporate Origins of Judicial Review, 116 Yale L.J. 502, 513 (2006).

¶5 How can this Court decide whether a proposal is repugnant to the Constitution? Justice Opala of this Court described the circumstances under which we might find a law repugnant:

Only in the clearest case of firmly settled and stable federal constitutional jurisprudence that absolutely condemns the proposed measure as facially impossible of enforcement, application or execution - and then only if the protestants have standing to complain of constitutional infirmity - would this court ever be justified in not clearing an initiative petition for submission to a vote of the people.

In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122838 P.2d 1jurisprudence, but with the language of the Constitution itself. I thus disagree with the Majority's assumption that controlling Supreme Court case law--favorable or unfavorable--should determine whether an initiative petition may be put to a vote. Article 2, Section 1 does not refer to legal decisions, but to the language of the Constitution itself.

¶6 The mere fact that a Petition opposes or contradicts case law does not show that it is repugnant. Supreme Court opinions are themselves works in progress. Jurisprudence is seldom definitive. Any given case may interpret a constitutional provision, but those interpretations are subject to the courts making them. They may change over time. Compare, e.g., Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) and Roe v. Wade, 410 U.S. 113 (1973). An opinion, or a series of opinions, may focus on developing legal theory. For any given theory, for any specific holding or legal finding, there will remain unlitigated theories and claims which, when subsequently raised, may prompt different legal interpretations and different results. Or a case may be decided purely on stare decisis grounds, leaving open the possibility that a future court may choose a different path. Case law is inherently malleable and cannot guide us to determine whether a proposal is repugnant to the Constitution.

¶7 Here's an example from this Court. In 1992, this Court found that Initiative Petition No. 349, restricting a woman's right to abortion, was unconstitutional in light of a United States Supreme Court ruling. In re Initiative Petition No. 349, 1992 OK 122Id. However, Justice Wilson, joined by Chief Justice Opala in dissent, found that it violated the separation of powers doctrine for this Court to exercise judicial power in order to "interfere with the legislative process invoked by the initiative petition." Id., 1992 OK 122Id. at ¶ 7, 838 P.2d at 18 (Wilson, J., dissenting) (footnote omitted). Chief Justice Opala also wrote separately, noting that the Court's decision amounted to "impermissible restraint on the free exercise of political speech." Id., 1992 OK 122Id., 1992 OK 122

¶8 This Court's decision to consider the Petition's constitutionality in this case oversteps our role. It is of course the province of the courts to interpret the laws and the Constitution--to say what the law is. Marbury v. Madison, 5 U.S. 137, 177 (1803). But first, there must be a law to interpret. In Oklahoma, laws are made by the Legislature and approved by the Governor. Okla. Const. art 5, § 7, art. 6, § 11. Or, under Article 2 Section 1, the people acting as a legislature may alter or reform the law. Specifically, the "first power reserved by the people is the initiative. . . ." Okla. Const. art. 5, § 2. The people may both propose laws and constitutional amendments, and "enact or reject the same at the polls." Okla. Const. art. 5, § 1. Until a measure is actually enacted, either through legislation or at the polls, this Court has no business declaring whether it is legal.

¶9 Why is this important? Article 2, Section 1 reserves all political power to the people. If this means anything, then the people must be free to exercise that power by proposing changes to the law. When this Court steps in (as it does here) before signatures are even gathered, it mandates the outcome of the initiative petition process before it can truly begin. This Court is deciding the "case" before there is a case, before there is even a law. The people of the state may choose to propose a law that would contradict controlling case law; nothing in Section 1 prohibits them from doing so. Should such a measure be put to a vote and pass, and be challenged in court, this Court might ultimately conclude the resulting law could not stand. However, that has nothing to do with the people's right to vote on it.

¶10 This Court may only ask whether the Petition directly contradicts or opposes specific language found in the Constitution. I cannot find that it does. To be contradictory, inconsistent or in opposition requires a specificity of language just not present here. Say the people proposed a constitutional amendment, or a law, prohibiting women from voting. This would directly contradict the Nineteenth Amendment, which specifically provides that the right to vote shall not be denied or abridged on account of sex. U.S. Const. amend. XIX. What if the people proposed to create a state-run institution of slavery? This could not legally and logically exist with the provisions forbidding slavery found in the Thirteenth Amendment. U.S. Const., amend. XIII. If the people propose legislation restricting voting rights only to people whose skin color is within a particular range of colors found in the current Pantone SkinTone Guide? That would oppose the Fifteenth Amendment's stricture against denying or abridging the right to vote based on color. U.S. Const. amend XV. Denying the right to vote to people over age 70? Inconsistent with the Twenty-Sixth Amendment. U.S. Const., amend. XXVI. Prohibiting the manufacture, sale, or transportation of intoxicating liquors within the United States or any state therein, or their importation or exportation? That is, what if the People tried by legislation to recreate the Eighteenth Amendment? That would violate the Twenty-First Amendment, which repealed that very provision. U.S. Const., amend. XXI.

¶11 These all seem like simple, even obvious, examples. But the point is that we can't make that kind of comparison here. Is it possible to write a law, similar to the Petition, which could be said to violate the First Amendment's language? Certainly, and the Supreme Court has held that various states have done so. Is it possible to write a law, similar to the Petition, which does not violate that language? Again, certainly, and the Supreme Court has so held. Both parties rely on these Supreme Court cases to support their positions. That fact tells me that the Petition cannot be either consistent or inconsistent with the First Amendment based on the constitutional language alone. And if it cannot, then this Court cannot find that it is repugnant to the Constitution.

¶12 I agree the Petition should go to a vote of the people. I believe it is premature for this Court to intervene in the process. For this reason I dissent to that part of the opinion which determines the Petition's constitutionality.

FOOTNOTES

Oklahoma Call for Reproductive Justice v. Drummond, 2023 OK 24526 P.3d 1123

 
 
 
 
 
 
 
 
 
 The Oklahoma Supreme Court
 2100 N. Lincoln Blvd., Suite 1
 Oklahoma City, OK 73105